COMMON CAUSE/GEORGIA, League of Women Voters of Georgia, Inc., The Central Presbyterian Outreach and Advocacy Center, Inc., Georgia Association of Black Elected Officials, Inc., The National Association for the Advancement of Colored People (NAACP), Inc., through its Georgia State Conference of Branches, Georgia Legislative Black Caucus, Concerned Black Clergy of Metropolitan Atlanta, Inc., and the following qualified and registered voters under Georgia law: Mrs. Clara Williams, Plaintiffs,

v.

Ms. Evon BILLUPS, Superintendent of Elections for the Board of Elections and Voter Registration for Floyd County and the City of Rome, Georgia, Ms. Tracy Brown, Superintendent of Elections of Bartow County, Georgia, Mr. Gary Petty, Ms. Michelle Hudson, Ms. Amanda Spencer, Mr. Ron McKelvey, and Ms. Nina Crawford, members of the Board of Elections and Registration of Catoosa County, Georgia, Judge John Payne, Superintendent of Elections of Chattooga County, Georgia, Ms. Shea Hicks, Superintendent of Elections for Gordon County, Georgia, Ms. Jennifer A. Johnson, Superintendent of Elections for Polk County, Georgia, Mr. Sam Little, Superintendent of Elections for Whitfield County, Georgia, individually and in their respective official capacities as superintendents or members of the elections boards in their individual counties, and as class representatives under Federal Rule of Civil Procedure 22(b)(1) and (b)(2) of a class consisting of all superintendents and members of city and county boards of elec-tions throughout the State of Georgia, and Honorable Cathy Cox, individually and in her official capacities as Secretary of State of Georgia and Chair of the Georgia Elections Board, Defendants.

No. CIVA. 4:05CV0201HLM.

United States District Court,
N.D. Georgia,
Rome Division.

Oct. 18, 2005.

David G.H. Brackett, Emmet J. Bondurant, II, Bondurant Mixson & Elmore, Elizabeth Lynn Littrell, Gerald R. Weber, Margaret Fletcher Garrett, Meredith Bell-Platts, Moffatt Laughlin McDonald, Neil T. Bradley, American Civil Liberties Union Foundation of Georgia, Inc., Miles J. Alexander, Seth Aaron Cohen, Kilpatrick Stockton, Ralph Irving Knowles, Jr., Doffermyre Shields Canfield Knowles & Devine, Tisha Rae Tallman, Mexican American Legal Defense & Educational Fund (Maldef), Atlanta, GA, Edward Hine, Jr., Office of Edward Hine, Jr., Rome, GA, Jon M. Greenbaum, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Plaintiffs.

Peter R. Olson, Jenkins & Olson, Cartersville, GA, Clifton M. Patty, Jr., Office of Clifton M. Patty, Jr., Ringgold, GA, Lewis Branch Sutton Connelly, Cook & Connelly, Summerville, GA, Anne Ware Lewis, Strickland Brockington Lewis, Mark Howard Cohen, Troutman Sanders, Stefan Ernst Ritter, Office of State Attorney General, Atlanta, GA, for Defendants.

### ORDER

HAROLD L. MURPHY, District Judge.

This case is an action to have the photo identification ("Photo ID") requirement in the 2005 amendment to O.C.G.A. § 21–2–417 (Act No. 53), declared unconstitutional both on its face and as applied, and to

enjoin its enforcement on the ground that it imposes an unauthorized, unnecessary, and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters, in violation of article II, section 1, paragraph 2 of the Georgia Constitution, the Fourteenth and Twenty–Fourth Amendments to the federal Constitution, the Civil Rights Act of 1964 (42 U.S.C.A. § 1971(a)(2)(A) and (a)(2)(B)), and Section 2 of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973(a)). The case is before the Court on Plaintiffs' Motion for Preliminary Injunction [2][23].

## I. Background

### A. The Parties

Plaintiff Common Cause/Georgia is a chapter of Common Cause, Inc. (Compl. ¶ 1(a).) Common Cause is a non-partisan citizen lobby organized as a not-for-profit corporation under the laws of the District of Columbia, and is devoted to causes such as electoral reform, ethics in government, and the protection and preservation of the rights of all citizens to vote in national, state, and local elections, including educating voters about voting rights and procedures. (*Id.*)

Plaintiff League of Women Voters of Georgia is a non-partisan Georgia non-profit corporation that was founded in 1920. (Compl. ¶ 1(b).) Plaintiff League of Women Voters of Georgia's purpose is to encourage the informed and active participation by citizens in government at all levels, including the protection of the right of all citizens to vote and the education of voters about voting rights and procedures. (*Id.*)

Plaintiff The Central Presbyterian Outreach and Advocacy Center, Inc. is a Georgia non-profit corporation that provides support to people in poverty, including emergency services for basic human needs and assistance in achieving self-sufficiency, including assisting individuals in obtaining photo identification. (Compl. ¶ 1(c).)

Plaintiff Georgia Association of Black Elected Officials, Inc. is an unincorporated association of more than 700 elected officials throughout the State of Georgia who regularly conduct election campaigns and seek the votes of all registered, eligible voters. (Compl. ¶ 1(d).) It also promotes voter registration, education, and participation, preserves minority voting rights, and fights to ensure that no qualified voters are turned away on Election Day for failure to possess a Photo ID card in violation of their right to vote. (*Id.*)

Plaintiff the National Association for the Advancement of Colored People ("Plaintiff NAACP"), through its Georgia State Conference of Branches, is the nation's oldest civil rights organization. (Compl. ¶ 1(e).) Plaintiff NAACP was formed in 1909 by a multiracial group of activists, and has nationwide membership as well as members and offices in Georgia. (*Id.*) Plaintiff NAACP has advocated for the advancement and protection of voting rights for minorities, and, throughout its history, has fought for access to the ballot, for its members and for others. (*Id.*) It also has fought to ensure that racial minorities, low income people, and economically disadvantaged people have access to the ballot box and an equal opportunity to participate in the political process. (*Id.*)

Plaintiff Georgia Legislative Black Caucus ("Plaintiff GLBC") was formed in 1966 and consists of elected African–American members of the House and Senate of the Georgia General Assembly. (Compl. ¶ 1(f).) Plaintiff GLBC's members, as elected representatives, engage in election campaigns, seek votes of registered, eligible voters, and also seek to make certain that the right to vote of all eligible citizens is protected and that no eligible voters are

discouraged or prevented from voting on election day for failure to possess a Photo ID card in violation of their right to vote. (*Id.*)

Plaintiff Concerned Black Clergy of Metropolitan Atlanta, Inc. is a non-partisan, interfaith religious organization of mostly African–American members and laity whose mission is to provide leadership, advocacy, and service to the poor, the homeless, and the helpless in the metropolitan Atlanta area, including protecting their rights as citizens to full participation in the democratic process, including the right to register and vote without undue interference. (Compl. ¶ 1(g).)

Plaintiff Clara Williams is an African–American and duly qualified and registered voter residing in the City of Atlanta and Fulton County, Georgia. (Compl. ¶ 1(h)(ii).) Plaintiff Williams does not possess a Georgia driver's license, passport, or other form of government-issued Photo ID, and cannot readily obtain a Photo ID card from the State Department of Driver Services. (*Id.*)

Defendant Evon Billups is the Superintendent of Elections for the Board of Elections and Voter Registration for Floyd County, Georgia, and is charged with the duty of conducting elections in Floyd County, Georgia, and the City of Rome, Georgia. (Compl. ¶ 2(a)(i).) Plaintiffs have sued Defendant Billups in her individual and official capacities. (*Id.*)

Defendant Tracy Brown is the Superintendent of Elections for the Board of Elections and Voter Registration for Bartow County, Georgia, and is charged with the duty of conducting elections in Bartow County, Georgia. (Compl. ¶ 2(a)(ii).) Plaintiffs have sued Defendant Brown in her official and individual capacities. (*Id.*)

Defendants Gary Petty, Michelle Hudson, Amanda Spencer, Ron McKelvey, and Nina Crawford are members of the Board of Elections and Voter Registration for Catoosa County, Georgia, and are charged with the duty of conducting elections in Catoosa County, Georgia. (Compl. ¶ 2(a)(iii).) Plaintiffs have sued those Defendants in their official and individual capacities. (*Id.*)

Defendant Judge John Payne is the Superintendent of Elections for the Board of Registrars for Chattooga County, Georgia, and is charged with the duty of conducting elections in Catoosa County, Georgia. (Compl. ¶ 2(a)(iv).) Plaintiffs have sued Defendant Payne in his official and individual capacities. (*Id.*)

Defendant Shea Hicks is the Superintendent of Elections for the Board of Elections and Registrations for Gordon County, Georgia, and is charged with the duty of conducting elections in Gordon County, Georgia. (Compl. ¶ 2(a)(v).) Plaintiffs have sued Defendant Hicks in her official and individual capacities. (*Id.*)

Defendant Jennifer A. Johnson is the Superintendent of Elections for the Board of Elections and Voter Registration for Polk County, Georgia, and is charged with the duty of conducting elections in Polk County, Georgia. (Compl. ¶ 2(a)(vi).) Plaintiffs have sued Defendant Johnson in her official and individual capacities. (*Id.*)

Defendant Sam Little is the Superintendent of Elections for the Board of Elections and Registration for Whitfield County, Georgia, and is charged with the duty of conducting elections in Whitfield County, Georgia. (Compl. ¶ 2(a)(vii).) Plaintiffs have sued Defendant Little in his official and individual capacities. (*Id.*)

Defendant Cathy Cox is the Secretary of State for the State of Georgia, and is Chair of the State Election Board. (Compl. ¶ 2(a)(viii).) Defendant Cox has been designated as the Chief Election Official for

purposes of the federal Help America Vote Act of 2002, and also is the Chief Election Official for purposes of the National Voter Registration Act of 1933. (*Id.*) Plaintiffs have sued Defendant Cox in her individual and official capacities. (*Id.*)

Plaintiffs allege that the superintendents and board members of the city and county boards of elections named in paragraphs 2(a)(i) through 2(a)(vii) of the Complaint are members of a class that consists of superintendents and members of city and county boards of elections in each of the 159 counties in Georgia, who are so numerous as to make their joinder impracticable. (Compl. ¶ 6.) Plaintiffs seek certification of a defendant class of all superintendents and members of all city and county boards of election in Georgia under Federal Rule of Civil Procedure 23(b)(1) and (b)(2). (*Id.* ¶ 7.)

## B. The Georgia Photo ID Requirement

Prior to the 1998 elections, voters in Georgia, like registered voters in a majority of other states, were not required to present identification as a condition of voting. (Compl. ¶ 8.) In 1997, the Georgia General Assembly adopted O.C.G.A. § 21-2-417, which required registered voters in Georgia to identify themselves by presenting one of seventeen forms of identification to election officials as a condition of being admitted to the polls and of being allowed to vote. (State Defs.' Initial Br. Opp'n Pls.' Mot. Prelim. Inj. Ex. 1.) Prior to its amendment in 1997, O.C.G.A. § 21-2-417 permitted, but did not require, registered voters to present a Georgia driver's license or other form of official photographic identification as a method of identification as a condition of voting. (Compl. ¶ 10.) Under the version of O.C.G.A. § 21-2-417 as amended in 1997, voters remained free to use any of eight other methods of identification for voting, including a birth certificate, a social security card, a copy of a current utility bill, a government check, a payroll check, or a bank statement showing the voter's name and address. (State Defs.' Initial Br. Opp'n Pls.' Mot. Prelim. Inj. Ex. 1.) Additionally, voters who did not have, or could not find, one of the seventeen forms of identification specified in former O.C.G.A. § 21-2-417(a), were entitled to be admitted to the polls, to be issued a ballot, and to be allowed to vote simply by signing a statement under oath swearing or affirming that he or she is the person identified on the elector's certificate. (*Id.*)

In 2005, the Georgia General Assembly adopted House Bill 244, or Act 53 ("HB 244"), which amended O.C.G.A. § 21-2-417 to require that all registered voters in Georgia who vote *in person* in all primary, special, or general elections for state, national, and local offices held on or after July 1, 2005, present a government-issued Photo ID to election officials as a condition of being admitted to the polls and before being issued a ballot and being allowed to vote. Plaintiffs have presented evidence indicating that the Georgia House of Representatives approved the Conference Committee Report on Act 53 by a vote of eighty-nine Republicans and two Democrats, while seventy-two Democrats and three Republicans voted against it. (Decl. of Ron D. Hockensmith ¶ 5 & Ex. 1.) The Senate adopted the Conference Committee Report on Act 53, with thirty-one Republicans and no Democrats voting in favor of the Act and eighteen Democrats and two Republicans voting against the Act. (*Id.*)

Plaintiffs have submitted the Declaration of Margaret S. Smothers, the former Executive Director of the League of Women Voters of Georgia. (Decl. of Margaret S. Smothers ¶ 2.) Ms. Smothers served as the League of Women Voters of Georgia's

lobbyist during the 2005 session of the Georgia General Assembly, and worked on voting rights issues, including the proposals to require Photo ID. (*Id.* ¶¶ 2–3.) Ms. Smothers observed:

4.

One of the objections opponents had to the photo id proposals was that the proposals included no funding for public education to inform registered voters of the new requirements that they present a photo id card in order to have their vote counted. In contrast, when Georgia shifted to electronic voting machines, the budget and staff of the Secretary of State's office was temporarily increased in order to engage in extensive public education efforts to prepare voters for that change. At the March 21, 2005 hearing on HB 244 before the Senate Committee on State and Local Governmental Operations (SLOGO), Randall Evans, who sponsored the bill and who is currently a member of the State Elections Board expressed the opinion that the Secretary of State's office had funds available from its current budget and that the state could rely on the public education efforts of such groups as the NAACP and AARP. Similar statements about the advocacy groups being sufficient to educate the public were made on the Senate floor during the March 29, 2005 debate on the photo id bill.

5.

Advocacy groups opposed to the legislation suggested the issue be studied prior to the next legislative session to determine if there were in fact a serious number of incidents of voter impersonation. At the SLOGO hearing on March 21, 2005 referred to above, Senator John Wiles, chair of the committee, asked if the groups would prefer the legislation to be enacted in the 2005 session, thus, in his view, providing a year for the

groups to conduct public education. It was apparent from this comment that the chair was either unaware or was not concerned that municipal elections are conducted in odd years.

(*Id.* ¶¶ 4–5.)

Defendant Cathy Cox, Georgia's Secretary of State ("Secretary of State Cox"), wrote a memorandum to the members of the Georgia State Senate, asking that the senators consider the "staggering opportunities for voter fraud" that HB 244 would create. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. A at 1.) Secretary of State Cox observed:

By allowing any person, at any time within 45 days before an election, to vote an absentee ballot by mail—with no ID requirement and no requirement to state one of the current conditions for voting absentee ((O.C.G.A. § 21-2-380)—such as being out of town on election day, having a disability, being over 75 years old, etc.), you would be opening a gaping opportunity for fraud. At virtually every meeting of the State Elections Board during the past 10 years, we have dealt with cases involving fraud or election law violations in handling or voting absentee ballots. HB 244 removes all restrictions on voting by mail, and thus makes it quite simple for someone inclined to commit fraud to do so.

This completely contradicts the reasons stated for another measure contained in HB 244—the Photo ID requirement. If the authors are indeed concerned about voter fraud, they would not likely authorize the easiest—and most prevalent form—of election law violations: unregulated voting by mail. In the past 9 years, neither my staff nor I can recall a single case or complaint of a voter impersonating another voter at the polls—the issue sought to be corrected by mandatory photo identification. And had this been occurring, some

voter surely would have complained upon finding that someone else had voted under their name. It hasn't happened.

I urge you to fully consider all the changes proposed by HB 244. This bill started out as the "housekeeping" legislation proposed by my office, but other bills—HB 597 and SB 84—have now been merged into it. The bill attempts to solve a problem that does not exist while expanding the opportunity for fraud in the area that has long been the most vulnerable to this type of abuse— the mailed absentee ballot.

(*Id.* at 1–2.)

On April 8, 2005, Secretary of State Cox wrote a letter to Governor Perdue expressing reservations about the Photo ID requirement contained in HB 244, and urging Governor Perdue to veto the bill. In her April 8, 2005, letter, Secretary of State Cox observed:

"It is my strong belief that the picture identification requirement in House Bill 244 is (1) unnecessary, (2) creates a very significant obstacle to voting on the part of hundreds of thousands of Georgians, including the poor, the infirm and the elderly who do not have drivers licenses because they are either too poor to own a car, are unable to drive [a] car, or have no need to drive a car, (3) very unlikely to receive pre-clearance under the Voting Rights Act by the Department of Justice, (4) violates Art. II, section I paragraph I of the Georgia Constitution by adding a condition on the right to vote that is not contained in the constitution and (5) imposes an undue burden on a fundamental right of all citizens, the right to vote, in violation of both the state and federal constitutions."

(*Id.* at 1.)

Secretary of State Cox also expressed her belief that the Photo ID requirements of House Bill 244 are unnecessary:

One of the primary justifications given by the Legislature for the passage of the photo identification provisions of House Bill 244—the elimination of voter ID fraud at the polls—is an unfounded justification. I cannot recall one documented case of voter fraud during my tenure as Secretary of State or Assistant Secretary of State that specifically related to the impersonation of a registered voter at voting polls. Our state currently has several practices and procedures in existence to ensure that such cases of voter fraud would have been detected if they in fact occurred, and at the very least, we would have complaints of voters who were unable to vote because someone had previously represented himself or herself as such person on that respective Election Day. As a practical matter, there is no possibility that vote fraud of this type would have gone undetected if it had in fact occurred because there is a list of registered voters at each polling place that is checked off as each person votes. If the impersonator voted first, and the legitimate voter came to the polling place later in the day and tried to vote, he or she would be told that they had already "voted" and would not be allowed to vote a second time in the same day. It is reasonable to suspect that a voter who cared enough to show up at the polls to cast a ballot would almost certainly have complained—but there have been no such complaints. If the opposite occurred, and the legitimate person came to the polls first and cast his ballot, the impersonator who showed up later would not be allowed to vote for the same reason and the attempted fraud would have been prevented.

In addition, this state has adopted severe criminal sanctions for the type of voter impersonation that is purportedly

of concern and it is evident that such penalties have been a sufficient deterrent. In essence, there is no voter fraud problem currently in existence that House Bill 244 addresses. Additionally, the concern for this type of voter fraud has not prompted other states to approve legislation as restrictive as House Bill 244. Forty-two of those states provide for other valid forms of identification besides photo identification. Of the other seven states, not one is as restrictive as the legislation recently enacted in our state. If this type of voting fraud was a national trend, other states would likely be adopting legislation as restrictive as House Bill 244.

In contrast to the lack of voter fraud relating to impersonation of voters at polls during my tenure, the State Election Board has reviewed numerous cases of voter fraud relating to the use of absentee ballots. However, the Legislature, in adopting House Bill 244 grossly expanded the opportunities for absentee voting by mail without any photographic identification requirement whatsoever, even though absentee ballots pose more of a threat of voting fraud than people voting in a polling location in their community. As a result, the type of voter fraud that *has* frequently occurred in our state is not addressed, and in fact is enhanced by the expansion of vote-by-mail opportunities. In sum, the justification for House Bill 244 is but a pretext.

(Pls.' Br. Supp. Mot. Prelim. Inj. Ex. B at 1–2.) Secretary of State Cox also observed that the Photo ID requirements created substantial obstacles to many Georgia voters:

Requiring someone who is otherwise registered and fully qualified to vote to present a government issued picture identification at the polling place as a condition of voting places a very real burden on many people, and especially upon the poor and elderly who do not own or cannot drive a car and therefore do not have drivers' licenses. It is estimated by the League of Women Voters and the AARP that an estimated 152,664 individuals over the age of 60 who voted in the 2004 presidential election do not have a Georgia driver's license and are likely not to have other photo identification. For such voters to obtain identification is often an unnecessarily burdensome task, particularly if such voters are in retirement communities and assisted living facilities, or live in rural areas. In addition, for many of the poorest residents of our state, photographic identification is not just a matter of unnecessary documentation that has no direct bearing on their day to day lives (they often have no need to drive or travel, or otherwise engage in activities that require a license), but is a burden of cost, economy and time. Although seemingly nominal, the $8.00 fee for an identification card may be a cost that many of our poor residents are unable to bear. Given the fact that the United State[s] Supreme Court has held that a $1.50 poll tax is an unconstitutional burden on the ability [of] an individual to vote (*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)), an $8.00 fee for an identification card required by the state would also seemingly be unconstitutional, even if such fee may be waived by the state in the event that a voter swears that he or she is indigent. In fact, to require that someone swear and affirm they are indigent when they are above the level of indigence but nonetheless too poor to afford the cost of an identification card, is both an affront to that person as well as an unlawful requirement that he or she swear to something

that is not true. In addition, there are other costs related to obtaining an identification [card] which the state does not have the ability to waive. For an individual working on an hourly wage, the time it takes to travel to a DMVS (which may be an unreasonable distance away from the resident[']s home or office), wait in the lengthy lines that result from only having 56 DMVS offices in the state (according to the list of locations posted on *www.dmvs.ga.gov* ) and then the return commute, results in actual lost wages. For the state to require this of our citizens, some of whom cannot afford to take such time off, is an unnecessary burden related to the exercise of that person's right to vote.

The geography of state DMVS offices poses a significant burden on many residents who would be required to obtain identification in order to vote. Given this state has only 56 DMVS offices, citizens without cars who reside in 103 of the 159 counties in Georgia must travel outside their home counties to obtain a state-issue[d] picture ID in order to vote. Nor is there a single location to obtain such an ID in the city of Atlanta.

(*Id.* at 2–3.) Additionally, Secretary of State Cox expressed her belief that HB 244 violated article II, section 1, paragraph 2 of the Georgia Constitution because it imposed a qualification on voters that was not listed in the Georgia Constitution. (*Id.* at 4.) Finally, Secretary of State Cox expressed her belief that the Photo ID requirement imposed an undue burden on the fundamental right of citizens to vote:

> Our federal and state courts have consistently recognized the right to vote as one of the most fundamental rights of our citizens. *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The right to vote is "preservative" of other rights, and is one that bears the strictest of scrutiny and it is the fundamental nature of this right which cannot be burdened by state actions. *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The United States Supreme Court, in *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), recognized the close constitutional review required with respect to any restriction on the right to vote. In particular, the Supreme Court held in *Dunn* that "before the right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet strict constitutional scrutiny." In addition, our state Supreme Court has also held that "substantive due process requires that state infringement on a fundamental right be narrowly tailored to serve a compelling state interest." *State of Ga. v. Jackson,* 269 Ga. 308, 496 S.E.2d 912 (1998). Our Supreme Court has also held that "when it is established that the legislation 'manifestly infringes upon a constitutional provision or violates the rights of the people' that the statute should be declared unconstitutional." *Cobb County School District v. Barker,* 271 Ga. 35, 518 S.E.2d 126 (1999). The intersection of those two precedents presents two clear questions. First, acknowledging that the right to vote is a fundamental right, is House Bill 244 narrowly tailored to serve a compelling state interest? Second, is it established that the photo identification requirements of House Bill 244 do not manifestly infringe upon the rights of the people? Based on the foregoing facts referenced above, the answer to both of these questions is no.

(*Id.* at 5.)

On April 22, 2005, Governor Sonny Perdue signed HB 244, and the Photo ID

requirement of HB 244 became effective on July 1, 2005, subject to pre-clearance by the United States Department of Justice. (Compl. ¶ 15.) The Photo ID requirement of HB 244 is codified in O.C.G.A. § 21-2-417, which now provides:

(a) Except as provided in subsection (c) of this Code section, each elector shall present proper identification to a poll worker at or prior to completion of a voter's certificate at any polling place and prior to such person's admission to the enclosed space at such polling place. Proper identification shall consist of any one of the following:

(1) A Georgia driver's license which was properly issued by the appropriate state agency;

(2) A valid identification card issued by a branch, department, agency, or entity of the State of Georgia, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector;

(3) A valid United States passport;

(4) A valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state;

(5) A valid United States military identification card, provided that such identification card contains a photograph of the elector; or

(6) A valid tribal identification card containing a photograph of the elector.

(b) Except as provided in subsection (c) of this Code section, if an elector is unable to produce any of the items of identification listed in subsection (a) of this Code section, he or she shall be allowed to vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in subsection (a) of this Code section within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

(c) An elector who registered to vote by mail, but did not comply with subsection (c) of Code Section 21-2-220, and who votes for the first time in this state shall present to the poll workers either one of the forms of identification listed in subsection (a) of this Code section or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector. If such elector does not have any of the forms of identification listed in this subsection, such elector may vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in this subsection within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

O.C.G.A. § 21-2-417.

On August 26, 2005, the Department of Justice granted pre-clearance to Georgia's

Photo ID requirement. (State Defs.' Initial Br. Opp'n Pls.' Mot. Prelim. Inj. Ex. 3.)

At the same time that the General Assembly voted to require the presentation of a Photo ID for voting, the General Assembly also voted to amend O.C.G.A. § 40–5–103(a) to double the minimum fee for a Photo ID card from $10 to $20 for a five-year Photo ID, and to authorize a new ten-year Photo ID card for $35. (Compl. ¶ 16.) O.C.G.A. § 40–5–103(a) presently provides:

(a) Except as provided in subsections (b) and (c) of this Code section, the department shall collect a fee of $20.00 for a five-year card and a fee of $35.00 for a ten-year card, which fee shall be deposited in the state treasury in the same manner as other motor vehicle driver's license fees.

(b) The department shall collect a fee of $5.00 for the identification card for all persons who are referred by a nonprofit organization which organization has entered into an agreement with the department whereby such organization verifies that the individual applying for such identification card is indigent. The department shall enter into such agreements and shall adopt rules and regulations to govern such agreements.

(c) The department shall not be authorized to collect a fee for an identification card from those persons who are entitled to a free veterans' driver's license under the provisions of Code Section 40–5–36.

(d) The department shall not be authorized to collect a fee for an identification card from any person: .

(1) Who swears under oath that he or she is indigent and cannot pay the fee for an identification card, that he or she desires an identification card in order to vote in a primary or election

in Georgia, and that he or she does not have any other form of identification that is acceptable under Code Section 21–2–417 for identification at the polls in order to vote; and

(2) Who produces evidence that he or she is registered to vote in Georgia.

This subsection shall not apply to a person who has been issued a driver's license in this state.

(d) The commissioner may by rule authorize incentive discounts where identification cards are renewed by Internet, telephone, or mail.

O.C.G.A. § 40–5–103.

The Communications Office of Georgia prepared a press release as to HB 244 stating that after the effective date of HB 244, only the following forms of Photo ID will be acceptable: (1) a Georgia Driver's license; (2) a State Identity Card; (3) a passport; (4) a Government Employee ID card; (5) a military ID card; and (6) a tribal ID card. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. F.) According to the same press release, the following forms of previously acceptable identification will no longer be accepted by election officials as valid forms of voter identification: (1) a birth certificate; (2) a Social Security Card; (3) a Certified Naturalization Document; (4) a current utility bill; (5) a bank statement; (6) a government check or paycheck; or (7) other government documents. (*Id.*) The information also includes a statement from Senator Cecil Stanton indicating that the Legislature wanted to " 'protect the integrity of the [voting] process" ' when it enacted the Photo ID law. (*Id.* at 2.)

The new Photo ID requirement applies only to registered voters who vote in person. (Oct. 12, 2005, Hr'g Tr.) The General Assembly imposed no similar Photo ID requirement on absentee voters, except

those voting absentee for the first time after registering by mail. (*Id.*)

After adopting HB 244, Georgia became one of only two states that requires registered voters to present a Photo ID as an absolute condition of being admitted to the polls and being allowed to cast a ballot in federal, state, and local elections. (Compl. ¶ 17.) Thirty states do not require registered voters to present any form of identification as a condition of admission to the polls or to cast a ballot. (*Id.*) Twenty states require voters to present some form of identification of the polls. (*Id.*) Of those states requiring identification, only two states, Georgia and Indiana, require that voters present a Photo ID as the sole method of identification as a condition of voting. (*Id.*; Oct. 12, 2005, Hr'g Tr.)

### C. Obtaining a Photo ID Card

The State of Georgia issues photo identification cards ("Photo ID cards") at its Department of Driver Services ("DDS") offices. (Decl. of Alan Watson ¶ 7 & Ex. C.) As of October 1, 2005, the DDS had fifty-six full-time customer service centers and two part-time customer service centers in Georgia. (*Id.*) Georgia has 159 counties, and individuals who reside in some counties, particularly counties in south and middle Georgia, may have lengthy drives to their nearest DDS service centers. (*Id.* Ex. C.)

No DDS service center is located within the Atlanta, Georgia, city limits or within the Rome, Georgia, city limits. (Watson Decl. Ex. C.) Fulton and DeKalb counties, however, have DDS customer service centers located at (1) 2801 Candler Road, Decatur, Georgia 30034; (2) 537 Shannon Mall, Union City, Georgia 30291; (3) 8610 Roswell Road, Suite 710, Sandy Springs, Georgia 30350; and (4) 8040 Rockbridge Road, Lithonia, Georgia. (*Id.* ¶ 8.) Floyd County, where Rome, Georgia, is located,

has a full-time DDS customer service center located at 3386 Martha Berry Highway. (*Id.* ¶ 9.)

Individuals who wish to renew a valid Georgia driver's license or Photo ID card may do so via the Internet. (Watson Aff. ¶ 18.) The DDS makes accommodations for disabled applicants who appear at a DDS service center to obtain a driver's license or Photo ID card. (*Id.* ¶ 17.) DDS policy directs that those applicants be brought to the front of the line, given a "Q–Matic" ticket, and provided with a seat. (*Id.*) The DDS employees then serve the disabled applicants in the order in which their number is called. (*Id.*)

DDS also has a mobile issuance bus known as the Georgia Licensing on Wheels ("GLOW") Bus. (Watson Decl. ¶ 10.) During September 2005, the GLOW Bus visited twenty-five locations. (*Id.* ¶ 10 & Ex. D.) During those visits, the DDS issued a total of 122 free Photo ID cards for voting purposes, ninety-one five-year Photo ID cards, thirteen ten-year Photo ID cards, sixty-one five-year driver's licenses, nine ten-year driver's licenses, and nine veteran's driver's licenses, and also processed two address changes. (*Id.*) In addition to the schedule for the GLOW bus established by the DDS, any group may sponsor the GLOW bus for an appearance in a particular location or community by making arrangements with the DDS. (*Id.* ¶ 11.)

Plaintiffs have presented evidence indicating that DDS employees gave inconsistent information in response to inquiries concerning the locations and dates for an appearance of the GLOW bus at Turner Field in Atlanta and for an appearance of the GLOW bus in downtown Atlanta. (Aff. of Jennifer Owens ¶¶ 3–4.) Plaintiffs also have presented evidence indicating that the GLOW bus has steps for access and is not accessible for purposes of the Americans with Disabilities Act, and that

individuals who are confined to wheelchairs cannot enter the bus. (*Id.* ¶ 6.) The photography and computer equipment on the GLOW bus is not mobile and cannot be removed from the bus to service individuals who cannot enter the bus. (*Id.*)

Defendants have presented evidence indicating that all individuals who wish to obtain a Photo ID card must complete an application and pay an applicable fee. (Decl. of Alan Watson ¶ 3.) If an applicant wishes to obtain a Photo ID card for voting purposes but cannot afford the card, a DDS employee will provide an affidavit to the applicant to complete. (*Id.*) The affidavit requires the applicant to swear or affirm that: (a) he or she is eligible to receive the Photo ID card free of charge because he or she is indigent and cannot pay the fee for the Photo ID card; (b) he or she desires a Photo ID card to vote in a primary or election in Georgia; and (c) he or she does not have any other form of identification that is acceptable under O.C.G.A. § 21–2–417 for voter identification purposes; (d) he or she is registered to vote in Georgia or is applying to register as part of his or her application for a Photo ID card; and (e) he or she does not have a valid driver's license issued by the State of Georgia. (*Id.* ¶ 4 & Ex. A.)

Defendants have presented evidence indicating that the DDS "considers the policy regarding the issuance of a free identification card for voting purposes to be completely nondiscretionary: if the applicant completes the Affidavit, the applicant is automatically eligible for a free photographic identification [card] for voting purposes." (Watson Aff. ¶ 5.) Defendants' evidence indicates that the DDS "makes no effort to verify the provisions of these completed affidavits relating to the applicant's eligibility for a free identification card for voting purposes and does not question the applicant." (*Id.*) According

to Defendants, "[i]n short, any applicant who completes such an affidavit will receive a free photographic identification card for voting." (*Id.*)

After HB 244 passed, the DDS trained its district managers concerning the above policy and the process for issuing free Photo ID cards for voting purposes. (Watson Decl. ¶ 6.) In turn, district managers trained their employees in the field offices. (*Id.*) Additionally, DDS sent a written notice concerning the policy and procedure for issuing free Photo ID cards for voting to all of its employees. (*Id.* & Ex. B.) Since the DDS began issuing the Photo ID cards for voting purposes, the DDS has received no complaints that individuals who wished to obtain the cards, whether free or paid, were denied the cards. (*Id.* ¶ 12.)

Defendants have presented evidence that as of July 30 or July 31, 2005, 5,674,479 Georgians possessed unexpired driver's licenses and 731,600 Georgians possessed unexpired Photo ID cards. (Watson Aff. ¶ 13.) When applying for licenses or Photo ID cards at the DDS service centers, applicants also may choose to register to vote under Georgia's "Motor Voter" law. (*Id.*)

In 2005, the fee for driver's licenses and Photo ID cards was $15.00 for four years. (Watson Aff. ¶ 15.) In 2005, the Georgia legislature changed the law to set a $20.00 fee for each driver's license and Photo ID card, and to provide that those driver's licenses and Photo ID cards would be valid for a term of five years. (*Id.*) The new law also provides that Georgians may purchase a ten-year driver's license or Photo ID card for $35.00. (*Id.*) Prior to 2005, the Georgia legislature had not increased the fees for driver's licenses or Photo ID cards in thirteen years. (*Id.*)

Defendants have presented evidence indicating that the fee charged for driver's

licenses and Photo ID cards is directly related to the costs of producing and issuing the driver's licenses and Photo ID cards. (Watson Aff. ¶ 16.) For the fiscal year ending June 30, 2004, the DDS conducted a total of 3,344,823 transactions involving producing and issuing driver's licenses and Photo ID cards, obtaining a total revenue of $42,304,316.06 while spending $47,018,808.73 of its budget for the fiscal year. (*Id.*)

The DDS's website explains how to apply for a Photo ID card. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. C.) The website states that applicants for a Photo ID card must furnish proof that they reside in Georgia and provide a valid Georgia residence address by presenting one of the following: (1) a utility bill with a valid Georgia residence address; (2) a bank statement with a valid Georgia residence address; (3) a rental contract or receipt with a valid Georgia residence address; (4) an employer verification; or (5) a Georgia license issued to the applicant's parent, guardian, or spouse. (*Id.*) The website further states that first-time applicants for a Photo ID card must provide an acceptable form of personal identification that includes the applicant's full name and month, day, and year of birth. (*Id.*) Acceptable forms of personal identification include: (1) "[o]riginal birth certificate (State issued) State Vital Statistics (Hospital birth certificates are not acceptable)"; (2) "[c]ertified copy of birth certificate (issued from Vital Statistics with affixed seal)"; (3) "[c]ertificate of birth registration"; (4) certified naturalization records; (5) an immigration ID card from Immigration and Naturalization; or (6) a valid passport. (*Id.*)

Plaintiffs also have submitted information from the Department of Vital Statistics' website concerning the process for obtaining a certified copy of a birth certifi-

cate. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. D.) To obtain a certified copy of a birth certificate, an applicant must provide "a photocopy of your valid photo ID, such as: driver's license, state issued ID card, or employer issued photo ID." (*Id.* at 1.) An applicant must pay a $10 search fee. (*Id.* at 2.)

The DDS and its predecessor, the Department of Motor Vehicles, only began collecting social security numbers three years ago, when they issued driver's licenses and Photo ID cards for four years. (Watson Aff. ¶ 19.) Consequently, DDS has collected only three-quarters of the social security numbers for individuals holding driver's licenses and social security cards. (*Id.*) Consequently, matching a list of social security numbers for registered voters with the DDS's list of social security numbers to determine the identity of registered voters who hold a driver's license or a Photo ID card is not possible.

**D. Declarations of Would–Be Voters**

Plaintiffs have submitted a number of declarations or affidavits of voters. The majority of the declarations state that the voters are not indigent, but do not have $20 to spend for a Photo ID card that they do not need except for purposes of voting. (Decl. of Annie Johnson ¶ 6; Decl. of Betty Kooper ¶ 5; Decl. of Cheryl D. Simmons ¶ 5; Decl. of Clarence Harp ¶ 5; Decl. of Eva Jeffrey ¶ 4; Decl. of George Cliatt ¶ 6; Decl. of Katherine Jackson ¶ 5; Decl. of L. Dewberry ¶ 5; Decl. of Luanna S. Miller ¶ 5; Decl. of Mary Cliatt ¶ 6; Decl. of Norma Pechman ¶ 5; Decl. of Ronnie Gibson ¶ 5; Decl. of Rosa Brown ¶ 8; Decl. of Ruth L. Butler ¶ 5; Decl. of Willie Boye ¶ 5.) A number of the voters do not drive or cannot afford a car. (A. Johnson Decl. ¶ 6; B. Kooper Decl. ¶ 5; C. Simmons Decl. ¶ 5; C. Harp Decl. ¶ 5; Decl. of Eleanor Whittenburg ¶ 2; E. Jeffrey Decl.

¶ 4; Decl. of Irene Laster ¶ 6; K. Jackson Decl. ¶ 5; L. Dewberry Decl. ¶ 5; Decl. of Lawrence Dorn ¶ 5; L. Miller Decl. ¶ 5; M. Cliatt Decl. ¶ 5; Decl. of Minnie Bridges ¶ 5; Decl. of Patricia Lane ¶ 4; Decl. of Pearl Kramer ¶ 5; R. Gibson Decl. ¶ 5; R. Brown Decl. ¶ 7; R. Butler Decl. ¶ 5; T. Jackson Decl. ¶ 5; W. Boye Decl. ¶ 5.)

Most of the voters do not have a driver's license, passport, tribal Photo ID, or other form of government-issued ID because they have no need for one. (A. Johnson Decl. ¶ 4; B. Kooper Decl. ¶ 4; C. Simmons Decl. ¶ 4; Decl. of Clara Williams ¶ 6; C. Harp Decl. ¶ 4; E. Whittenburg Decl. ¶ 4; E. Jeffrey Decl. ¶ 3; Decl. of Exie Brown ¶ 4; G. Cliatt Decl. ¶ 4; I. Laster Decl. ¶ 4; Decl. of Jason Benford ¶ 3; K. Jackson Decl. ¶ 4; L. Dewberry Decl. ¶ 4; L. Dorn Decl. ¶ 4; L. Miller Decl. ¶ 4; M. Cliatt Decl. ¶ 4; M. Bridges Decl. ¶ 4; N. Pechman Decl. ¶ 4; P. Lane Decl. ¶ 4; P. Kramer Decl. ¶ 4; R. Gibson Decl. ¶ 4; R. Brown Decl. ¶ 4; R. Butler Decl. ¶ 4; T. Jackson Decl. ¶ 5; W. Boye Decl. ¶ 4.) Quite a few of the voters are African–American. (A. Johnson Decl. ¶ 4; C. Williams Decl. ¶ 4; G. Cliatt Decl. ¶ 5; I. Laster Decl. ¶ 5; M. Cliatt Decl. ¶ 5; P. Lane Decl. ¶ 1; R. Brown Decl. ¶ 3.) Many of the voters are over sixty-five years old. (A. Johnson Decl. ¶ 1 (seventy-five years old); B. Kooper Decl. ¶ 1 (ninety years old); I. Laster Decl. ¶ 1 (eighty-eight years old); C. Williams Decl. ¶ 1 (sixty-eight years old); E. Brown Decl. ¶ 1 (eighty-two years old); G. Cliatt Decl. ¶ 1 (seventy-four years old); L. Miller Decl. ¶ 1 (eighty-four years old); M. Cliatt Decl. ¶ 1 (eighty-seven years old); M. Bridges Decl. ¶ 1 (eighty-five years old); N. Pechman Decl. ¶ 1 (eighty-four years old); P. Kramer Decl. ¶ 1 (eighty years old); R. Brown Decl. ¶ 1 (appears to be ninety-three years old); R. Butler Decl. ¶ 1 (eighty-nine years old).)

Several of the voters have physical or mental disabilities that make it difficult for them to travel to a DDS service center, to walk for long distances, or to stand in line. (A. Johnson ¶ 6 (physical disability); E. Whittenburg Decl. ¶ 2 (legally blind and uses walker to assist in walking); E. Brown Decl. ¶ 5 (confined to wheelchair); G. Cliatt Decl. ¶ 6 (poor health); I. Laster Decl. ¶ 6 (physical disability); J. Benford Decl. ¶ 5 (mental difficulties); L. Miller Decl. ¶ 5 (legally blind); M. Cliatt Decl. ¶ 6 (physical disability and confined to wheelchair); M. Bridges Decl. ¶ 5 (physical and visual impairment); P. Kramer Decl. ¶ 5 (physical impairment); R. Brown Decl. ¶ 7 (same).) Others have to rely on family members or friends for transportation, or cannot obtain transportation to a DDS service center. (E. Whittenburg Decl. ¶ 2 (relies on family for transportation; closest family member lives thirty-five miles away); E. Brown ¶ 6 (closest DDS service center eleven miles away; family members rarely available to transport her); J. Benford Decl. ¶ 5 (cannot obtain transportation to DDS service center); L. Dorn Decl. ¶ 5 (same).) Another voter would have difficulty taking off from work to go to a DDS service center to obtain a Photo ID. (L. Dewberry Decl. ¶ 5.)

Other voters had problems obtaining necessary information, such as birth certificates or valid driver's licenses from other states, required for issuing a Photo ID card. (E. Whittenburg Decl. ¶ 5 (assisted living resident would have to arrange for transportation to health department and pay $10 for birth certificate); I. Laster Decl. ¶ 6 (born in 1917 and it was not customary to deliver birth certificate in community at that time); P. Lane Decl. ¶¶ 5–6 (could not get Photo ID at four DDS service center because she lacked documentation from Virginia's Department of Motor Vehicles); R. Brown Decl. ¶ 6

(has no birth certificate).) One voter could not get a Photo ID card because the State of North Carolina could not find her birth certificate, but was issued a letter that was good enough to get a passport from the federal government—yet not good enough to get a Photo ID card. (Decl. of Ruth White ¶¶ 5–7.) Other voters had problems because their legal names did not match the names they used for voter purposes or the names on their birth certificates. (Decl. of Amanda Clifton ¶ 4 (divorce decree does not state intent to change name); C. Williams Decl. ¶ 4 (informally adopted and birth certificate name does not match voter registration).)

A declaration from George H. Carley, an Associate Justice of the Georgia Supreme Court, describes a lengthy wait at a DDS service center to renew a driver's license. (Decl. of George H. Carley ¶ 2 (describing standing in line at DDS service center for more than three hours to renew driver's license).) Another judge, Henry M. Newkirk, described taking his parents, ages eighty-one and eighty-two, to a DDS service center and standing in line for two hours to hold their places. (Decl. of Henry M. Newkirk ¶¶ 2–3.) He indicated that his parents would not have been able to stand in the line for so long because of their physical ailments, and could not have negotiated the process successfully without assistance. (Id. ¶¶ 4–5.)[1] Martin Crafter, a candidate for the Ft. Valley City Commission, described having to travel twenty miles to Warner Robbins to obtain a replacement driver's license, and stated that he had to request transportation from someone else to travel to the DDS service center. (Decl. of Marvin Crafter ¶¶ 2–4.)

## E. Census Data

Plaintiffs have presented data from the 2000 Census to support their claim of vote denial. According to that data, 4.4 percent of African–American households in Georgia have a male householder and no wife present, with children under eighteen years old, as compared to 2.7 percent of Caucasian, non-Hispanic households in Georgia. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. E at 2.) Additionally, 30.1 percent of African–American households in Georgia have a female householder with no husband present and children under eighteen years old, as compared to 7.1 percent of Caucasian, non-Hispanic households in Georgia. (Id.)

According to the Census data, 18.5 percent of African–Americans in Georgia who are over age twenty-five have no high school diploma, as compared to 11.8 percent of Caucasian, non-Hispanic individuals over age twenty-five in Georgia. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. E at 3.) 9.0 percent of African–Americans in Georgia who are over age twenty-five have less than a ninth-grade education, as compared to 5.5 percent of Caucasian, non-Hispanic individuals in Georgia who are twenty-five years and older. (Id.) Further, according to the data, 17.7 percent of African–American households in Georgia have no vehicle, as compared to 4.4 percent of Caucasian, non-Hispanic households in Georgia. (Id. at 9.)

## F. Declarations of Georgia Elections Officials

### 1. Shea Hicks

Shea Hicks is the Chairperson of the Gordon County Board of Elections and

---

**1.** During the October 12, 2005, preliminary injunction hearing, the Court overruled the State Defendants' objections to the declarations presented by Justice Carley and Judge Newkirk. The Court concluded that those declarations did not violate applicable ethical rules, and that Justice Carley likely would take the appropriate action if this case came before the Georgia Supreme Court at some point.

Voter Registration. (Decl. of Shea Hicks ¶ 2.) Ms. Hicks has served in that capacity since 1991. (*Id.*) In her capacity as Chairperson, she supervises all Gordon County elections, as well as elections for municipalities in Gordon County such as Fairmount, Ranger, Resaca, and Plainville. (*Id.*) The Gordon County Board of Elections also assists the City of Calhoun with its elections when the City of Calhoun requests such assistance. (*Id.*) The City of Calhoun has requested assistance from the Gordon County Board of Elections for the November 8, 2005, election. (*Id.*)

Ms. Hicks' office has not received complaints that voters cannot obtain the identification needed for in-person voting. (S. Hicks Decl. ¶ 3.) Ms. Hicks testified that the great majority of voters in Gordon County already use either a driver's license or a State-issued identification card to identify themselves at the polls. (*Id.*)

After the Photo ID requirement passed and obtained preclearance from the Justice Department, the Gordon County Board of Elections ordered new election materials from the Elections Division of the Secretary of State's Office (the "Elections Division"). (S. Hicks Decl. ¶ 4.) Those materials included voter certificates, which list the proper forms of identification for in-person voting, and posters for the polling places listing the forms of acceptable identification for in-person voting. (*Id.*) The Gordon County Board of Elections also attended training sessions conducted by the Elections Division. (*Id.*) Those sessions included training on the new Photo ID requirement. (*Id.*) The Gordon County Board of Elections has scheduled poll manager and poll worker training sessions for various dates during the next two weeks. (*Id.* ¶ 6.)

The Gordon County Board of Elections has made efforts to educate the public concerning the Photo ID requirement by providing information to the newspaper. (S. Hicks Decl. ¶ 4.) That information appeared in the local newspaper during the past weekend. (*Id.*)

Gordon County has the following elections scheduled for November 8, 2005:(1) a county-wide Special Local Option Sales Tax ("SPLOST") referendum; (2) a Fairmount city council election; and (3) elections for the Calhoun Board of Education and Calhoun City Council. (S. Hicks Decl. ¶ 5.) Ms. Hicks believes that issuing a preliminary injunction against the Photo ID requirement for the November 8, 2005, elections would cause tremendous confusion among election officials, poll workers, and voters. (*Id.* ¶ 7.) Ms. Hicks believes that the Gordon County Board of Elections cannot order and receive new voter certificates and poll posters in time for those elections, and states that the Gordon County Board of Elections does not have a sufficient supply of the certificates or posters reflecting the former identification requirements. (*Id.*) Additionally, Ms. Hicks believes that holding additional training for poll managers and poll workers would be necessary. (*Id.*)

Finally, Ms. Hicks opines that it would not be reasonable or feasible to require poll workers to compare the signatures on the voter certificates to the voter registration cards to verify the identity of voters. (S. Hicks Decl. ¶ 8.) According to Ms. Hicks, no such mechanism is in place and implementing one would be very costly. (*Id.*) Ms. Hicks also believes that such verification at the polls would be very time-consuming given the short amount of time available for verifying the signatures and the number of voters. (*Id.*)

### 2. Lynn Bailey

Lynn Bailey is the Executive Director of the Richmond County Board of Elections. (Decl. of Lynn Bailey ¶ 2.) Ms. Bailey has

served in that capacity since 1993. (*Id.*) In her capacity as Executive Director, she supervises all Richmond County elections, as well as elections for municipalities in Richmond County such as Augusta, Blythe, and Hephzibah. (*Id.*)

The Richmond County Board of Elections held a special election on September 20, 2005, to fill the unexpired term of State Senator Charles Walker. (Bailey Aff. ¶ 3.) According to Ms. Bailey, the changes made by the Photo ID requirement were "a nonissue." (*Id.*) She recalled that voters did not seem confused and that poll workers seemed to administer the new procedures properly. (*Id.*) Ms. Bailey testified that most of the voters showed the type of identification that was shown most often under the previous law—a driver's license or a State-issued identification card. (*Id.*)

According to Ms. Bailey, 12,826 people voted at the polls during the September 20, 2005, special election. (Bailey Decl. ¶ 4.) 12,813 of those individuals produced Photo ID at the polls. (*Id.*) The thirteen voters who did not produce a Photo ID at the polls voted provisional ballots. (*Id.*) Only two of those thirteen voters returned with a Photo ID within forty-eight hours. (*Id.*) The Richmond County Board of Elections does not know why the other eleven voters did not return, and it never heard anything else from those voters. (*Id.*)

Before the September 20, 2005, election, the Richmond County Board of Elections ordered new election materials from the Elections Division. (Bailey Decl. ¶ 5.) Those materials included voter certificates, which list the proper forms of identification for in-person voting, and posters for the polling places listing the forms of acceptable identification for in-person voting. (*Id.*) The Richmond County Board of Elections also attended training sessions conducted by the Elections Division. (*Id.*) Those sessions included training on the new Photo ID requirement. (*Id.*) The Richmond County Board of Elections also conducted poll worker training prior to the September 20, 2005, election. (*Id.*) Finally, the Richmond County Board of Elections has scheduled additional poll worker training for October 17 through October 19, 2005. (*Id.* ¶ 7.)

Before the September 20, 2005, election, the Richmond County Board of Elections made efforts to educate the public concerning the Photo ID requirement by speaking to neighborhood groups, by using the media, and by educating the candidates. (Bailey Decl. ¶ 5.) The Richmond County Board of Elections also booked the GLOW bus to allow voters to obtain a Photo ID, and the GLOW bus was stationed in Richmond County on September 6 and 7, 2005. (*Id.*) The Richmond County Board of Elections has requested that the GLOW bus return to Richmond County before the November 8, 2005, election. (*Id.* ¶ 7.)

Richmond County has the following elections scheduled for November 8, 2005: (1) an election to fill the offices of Mayor and five City Commission positions for the City of Augusta; (2) an election to fill the post of Marshal for the Civil and Magistrate Court; (3) a special election to fill the unexpired term of State Representative Henry Howard, who recently died; (4) a special election to fill an unexpired term in Board of Education District 9; (5) a SPLOST vote; and (6) municipal elections for Blythe and Hephzibah. (Bailey Decl. ¶ 6.) Ms. Bailey believes that issuing a preliminary injunction against the Photo ID requirement for the November 8, 2005, elections would cause tremendous confusion among election officials, poll workers, and voters. (*Id.* ¶ 8.) Ms. Bailey believes that the Richmond County Board of Elections cannot order and receive new voter certificates and poll posters in time for

those elections, and states that the Richmond County Board of Elections does not have a sufficient supply of the certificates or posters reflecting the former identification requirements. (*Id.*) Additionally, Ms. Bailey believes that holding additional training for poll managers and poll workers would be necessary. (*Id.*) Finally, Ms. Bailey states that the Richmond County Board of Elections would have to re-educate the public concerning the former identification requirements. (*Id.*)

Ms. Bailey opines that it would not be reasonable or feasible to require poll workers to compare the signatures on the voter certificates to the voter registration cards to verify the identity of voters. (Bailey Decl. ¶ 10.) According to Ms. Bailey, no such mechanism is in place and implementing one would be very costly. (*Id.*) Ms. Bailey also believes that such verification at the polls would be very time-consuming given the short amount of time available for verifying the signatures and the number of voters. (*Id.*)

Finally, Ms. Bailey is aware of speculation that people voted as other people under the former law. (Bailey Decl. ¶ 9.) According to Ms. Bailey, the Richmond County Board of Elections has never found substantiated evidence to support that speculation. (*Id.*) In any event, Ms. Bailey believes that evidence of voter impersonation would be difficult to find, because there is no way to track an impersonator after the impersonator leaves the polling place. (*Id.*)

### 3. Gary Smith

Gary Smith is the Director of Elections for the Forsyth County Board of Elections. (Decl. of Gary Smith ¶ 2.) Mr. Smith has served in that capacity since January 1, 2002. (*Id.*) In his capacity as Director of Elections, he supervises all Forsyth County elections, as well as elections for municipalities in Forsyth County such as Cumming. (*Id.*)

Mr. Smith opines that in-person voter impersonation would be easy to accomplish, as any person can buy a list of electors and determine who ordinarily does not vote. (Smith Decl. ¶ 4.) The imposter then can go to vote in place of someone who ordinarily does not vote. (*Id.*) According to Mr. Smith, without Photo ID or a reasonable method of comparing signatures on registration cards to signatures on voter certificate, there is no real·opportunity to prevent such fraud. (*Id.*)

Mr. Smith states that he recently reported six fraudulent voter registrations to the Forsyth County District Attorney's Office. (Smith Decl. ¶ 6.) According to Mr. Smith, the Photo ID requirements assist the Forsyth County Board of Elections in preventing those voters who have registered fraudulently from voting. (*Id.*) Mr. Smith opines that the opportunity for fraud existed under the prior law. (*Id.* ¶ 7.) Mr. Smith observes that limiting the forms of acceptable identification is helpful to the Forsyth County Board of Elections poll workers. (*Id.* ¶ 8.) Mr. Smith notes that many of the poll workers do not know the voters by sight. (*Id.* ¶ 9.)

Mr. Smith's office has not received complaints that voters cannot obtain the identification needed for in-person voting. (Smith Decl. ¶ 11.) Mr. Smith testified that the great majority of voters in Forsyth County already use either a driver's license or a State-issued identification card to identify themselves at the polls. (*Id.*)

Mr. Smith believes that issuing a preliminary injunction against the Photo ID requirement for the November 8, 2005, elections would cause tremendous confusion among election officials, poll workers, and voters. (Smith Decl. ¶ 10.) Mr. Hicks believes that the various Boards of Elec-

tions cannot order and receive new voter certificates and poll posters in time for those elections, and states that the Boards of Elections do not have time to hold additional training for poll managers and poll workers would be necessary. (*Id.*)

Mr. Smith opines that it would not be reasonable or feasible to require poll workers to compare the signatures on the voter certificates to the voter registration cards to verify the identity of voters. (Smith Decl. ¶ 5.) According to Mr. Smith, no such mechanism is in place and implementing one would be very costly. (*Id.*) Mr. Smith also believes that such verification at the polls would be very time-consuming given the short amount of time available for verifying the signatures and the number of voters. (*Id.*)

### 4. Lynn Ledford

Lynn Ledford is the Elections Supervisor for Gwinnett County, Georgia, and has served in that capacity for three years. (Decl. of Lynn Ledford ¶ 2.) Gwinnett County is the second-largest county in Georgia and is one of the fastest-growing counties in the United States. (*Id.*) Gwinnett County has approximately 341,000 registered voters and has more municipalities than any other county in Georgia. (*Id.*)

In her capacity as Elections Supervisor, Ms. Ledford supervises all Gwinnett County elections, and also serves as the official registrar of voters for municipalities in Gwinnett County. (Ledford Decl. ¶ 3.)

After the Photo ID requirement passed and obtained preclearance from the Justice Department, Gwinnett County held a runoff election on September 27, 2005, to fill the unexpired term of Phyllis Miller. (Ledford Decl. ¶ 4.) That election involved seventeen voting precincts. (*Id.* ¶ 6.) According to Ms. Ledford, the changes resulting from Georgia's new Photo ID requirement were a "non-issue." (*Id.* ¶ 5.) Specifically, Ms. Ledford recalled that voters did not seem confused, and poll workers properly administered the new requirements. (*Id.*) According to Ms. Ledford, most voters showed the type of identification that they previously showed most often—a driver's license or state-issued Photo ID card. (*Id.*) No voter cast a provisional ballot for lack of proper Photo ID. (*Id.*)

Prior to the September 27, 2005, election, Gwinnett County ordered new election materials, revised the manual used by poll officials, and sent e-mails and made telephone calls to poll managers to educate the poll managers and poll workers. (Ledford Decl. ¶ 6.)

Gwinnett County has elections scheduled for November 8, 2005. (Ledford Decl. ¶ 6.) Those elections involve twelve municipalities, including Auburn, Berkeley Lake, Braselton, Buford, Dacula, Duluth, Lawrenceville, Lilburn, Loganville, Norcross, Snellville, and Sugar Hill. (*Id.* ¶¶ 6–7.)

Gwinnett County already has obtained supplies of voter certificates, which list the proper forms of identification for in-person voting, and posters for the polling places listing the forms of acceptable identification for in-person voting for the November 8, 2005, election. (Ledford Decl. ¶ 8.) Gwinnett County has made efforts to educate the public concerning the Photo ID requirement by using media outlets and by speaking at public engagements. (*Id.*)

Ms. Ledford believes that issuing a preliminary injunction against the Photo ID requirement for the November 8, 2005, elections would cause tremendous confusion among election officials, poll workers, and voters. (Ledford Decl. ¶ 9.) Ms. Ledford believes that Gwinnett County cannot order and receive new voter certificates and poll posters in time for those elections,

and states that Gwinnett County does not have a sufficient supply of the certificates or posters reflecting the former identification requirements. (*Id.*) Additionally, Ms. Ledford believes that holding additional training for poll managers and poll workers would be necessary, and that it also would be necessary to re-educate the public concerning the change in the identification requirement. (*Id.*)

Ms. Ledford opines that it would not be reasonable or feasible to require poll workers to compare the signatures on the voter certificates to the voter registration cards to verify the identity of voters. (Ledford Decl. ¶ 10.) According to Ms. Ledford, no such mechanism is in place and implementing one would be very costly. (*Id.*) Ms. Ledford also believes that such verification at the polls would be very time-consuming given the short amount of time available for verifying the signatures and the number of voters. (*Id.*)

#### 5. Harry MacDougald

Harry MacDougald is a member of the Fulton County Board of Registration and Election ("FBRE"). (Decl. of Harry MacDougald ¶ 1.) As a member of the FBRE, Mr. MacDougald receives and reviews written reports from FBRE staff, information regarding voter fraud trends and indicia, complaints from voters who experience difficulty registering or voting, and reports of fraudulent voter registration and voting in Fulton County. (*Id.*) Fulton County is the largest county in Georgia, and has the largest number of registered voters. (*Id.* ¶ 2.) The FBRE is the superintendent of all Fulton County elections, and also administers elections under contract for several municipalities in Fulton County, including the City of Atlanta and the City of Roswell. (*Id.*)

Mr. MacDougald states that during his service on the FBRE, he has observed numerous problems with fraudulent voter registration applications. (MacDougald Decl. ¶ 3.) According to Mr. MacDougald, during the 2004 election cycle, numerous press accounts of fraudulent voter registration applications surfaced around the United States. (*Id.*) Mr. MacDougald states that he was aware of reports of fraudulent registration applications or investigations into fraudulent registration applications in at least eleven states, including Georgia, Florida, Ohio, Nevada, Colorado, Wisconsin, California, Oregon, Washington, Pennsylvania, and South Carolina. (*Id.*) Mr. MacDougald states that some of the same groups accused of registration fraud in other states were active in Georgia. (*Id.*)

According to Mr. MacDougald, the FBRE received a total of 2,456 voter registration applications submitted to the Secretary of State's office by an organization called The Georgia Coalition for the People's Agenda. (MacDougald Decl. ¶ 3.) The FBRE also received a smaller batch of voter registration applications from an organization called Head Count. (*Id.*) The transmittal from the Secretary of State's office noted that the applications were suspicious, and recommended that the FBRE use verification procedures. (*Id.*) The FBRE's staff examined the applications carefully and reported that all, or nearly all, of the applications appeared fraudulent. (*Id.*) Specifically, many of the applications were written in the same handwriting, had invalid social security numbers, or had invalid addresses. (*Id.*)

In 2004, the FBRE received 2,456 voter registrations that appeared to be fraudulent. (MacDougald Decl. ¶ 4.) The FBRE referred those matters to the Fulton County District Attorney, as well as to the United States Attorney for the Northern District of Georgia. (*Id.*) Although the Fulton County District Attorney apparent-

ly did not respond to the FBRE's referral, the United States Attorney's Office opened an investigation into the matter. (*Id.*)

FBRE also sent out "missing information" letters to 8,112 applicants for voter registration during 2004, including the 2,456 applications discussed in the preceding paragraph. (MacDougald Aff. ¶ 5.) The FBRE sends "missing information" letters to applicants for voter registration whose applications do not contain required information or whose applications contain "irregular" information. (*Id.*) In theory, applicants who receive the "missing information" will supply the missing information to the FBRE office, and will be duly registered to vote. (*Id.* ¶ 6.) If the FBRE receives no response to a "missing information" letter, the FBRE does not process the application. (*Id.*)

In response to its 8,112 "missing information" letters sent in 2004, the FBRE received only fifty-five responses sufficient to process the applications and add the voters to the rolls, for a response rate of 0.678 percent and a non-response rate of 99.32 percent. (MacDougald Decl. ¶ 7.) Ten of the responses received indicated fraud by stating that the individuals who received the "missing information" letters had never registered to vote. (*Id.*) The family of one of those individuals responded that the individual had died. (*Id.*) Meanwhile, the United States Postal Service returned 1,362 of the 8,112 "missing information" letters as undeliverable. (*Id.*) 6,685 of the individuals who received "missing information" letters never responded. (*Id.*)

According to Mr. MacDougald, another group of individuals succeeded in registering to vote in the latter part of 2004, but likely were not valid voters. (MacDougald Decl. ¶ 8.) In 2004, the FBRE had a record number of new registrations and mailed out precinct cards to newly registered vot-ers. (*Id.*) The FBRE had 45,907 new registrations between the deadline for registering to vote in the primary election and the deadline for registering to vote in the general election. (*Id.*) The FBRE mailed precinct cards to all of the 45,907 new registrants, and the United States Postal Service returned 3,071 of those cards as undeliverable. (*Id.*) 971 of those 3,071 registrants whose precinct cards were returned voted in the general election. (*Id.*)

Mr. MacDougald opined that in light of the above information indicating that the FBRE received 8,057 suspect registrations that it could not process because of missing information and that the FBRE received 3,071 precinct cards for newly registered voters returned as undeliverable, the FBRE received a total of 11,128 applications for voter registration that were suspect or problematic "in a serious way." (MacDougald Decl. ¶ 9.) The suspect or problematic voter applications constituted 6.71 percent of the total registration applications processed in Fulton County before the 2004 election. (*Id.*)

Mr. MacDougald is not aware of any complaints to the FBRE made by voters who cannot obtain the Photo ID required to vote in person at the polls. (MacDougald Decl. ¶ 12.) According to Mr. MacDougald, the "great majority" of Fulton County voters already use a driver's license or state-issued Photo ID card to vote at the polls. (*Id.*)

### 6. Declaration of Ann Hicks

Ann Hicks serves as an Assistant Director in the Elections Division, and has worked in the Elections Division for twenty-six years. (Decl. of Ann Hicks ¶ 2.) Ms. Hicks' duties include supervising six employees, assisting the Director of the Elections Division with the Division's budget, revising and ordering printed election forms, ordering other election materials

used by counties and municipalities for conducting elections, assisting counties with entry of election supply orders and with obtaining approval for shipment of those orders, entering election supply orders for most municipalities, assisting county and municipal elections officials and other parties with numerous election-related questions, and training county and municipal registrars concerning election procedures. (*Id.*) The Elections Division regularly assists county election officials and municipal election officials ("local election officials") with various tasks related to elections. (*Id.* ¶¶ 3–4.)

Local elections officials order election supplies, including voter certificates and poll posters advising voters of the required forms of identification, through the Elections Division. (A. Hicks Decl. ¶ 5.) County elections officials order their supplies electronically, while municipalities that conduct their own elections must telephone in their supply orders, which are entered by Elections Division staff. (*Id.*) The Elections Division also regularly provides training sessions for local election workers who, in turn, train their poll workers prior to elections. (*Id.* ¶ 6.)

After the passage of HB 244, Elections Division staff immediately began training local elections officials throughout Georgia concerning the new law so that the local elections officials could train their poll workers before the elections scheduled for August 30, 2005, September 20, 2005, September 27, 2005, and November 8, 2005. (A. Hicks Decl. ¶ 7.) The training also included instruction concerning the new Photo ID requirement for in-person voting and the removal of restrictions for absentee voting. (*Id.*) Specifically, the Elections Division conducted the following training: (1) training for county elections officials through the Georgia Election Officials Association on May 1 through May 4, 2005, which included nearly 400 participants; (2) training for municipal elections officials in June 2005 and July 2005 at four sites around the states, which included nearly 600 participants; (3) an additional training session for municipal elections officials at the University of Georgia held on September 20, 2005; (4) training for voter registrars through the Voter Registrar's Association of Georgia on August 7 through August 10, 2005, which included over 400 participants; and (5) training for newly-created boards of election in September 2005. (*Id.* ¶ 8.) In total, the Elections Department trained 2,000 participants during the past four months. (*Id.*)

After the Justice Department granted preclearance of the Photo ID requirement, approximately thirty-four municipalities held elections on September 20, 2005. (A. Hicks Decl. ¶ 9.) Further, Gwinnett County held a runoff election on September 27, 2005. (*Id.*)

The Elections Division distributed new supplies, including voter certificates and poll posters, to all counties and municipalities that it knew would hold elections on September 20, 2005. (A. Hicks Decl. ¶ 10.) Because the Photo ID requirement did not receive preclearance until after business hours on Friday, August 26, 2005, the Elections Division was very concerned about its ability to provide new forms and posters to all of the local elections boards and municipalities that planned to hold elections on September 20, 2005. (*Id.*)

At least 350 Georgia counties and municipalities will hold elections on November 8, 2005. (A. Hicks Decl. ¶ 11.) According to Ms. Hicks, a preliminary injunction against the Photo ID requirement would cause confusion. (*Id.* ¶ 12.) Specifically, the Elections Division could not hold new training with local elections officials so that those officials, in turn, could train their poll workers. (*Id.*) According to Ms.

Hicks, many local elections officials already have conducted their poll worker training for the November 8, 2005, election and would not have sufficient time to conduct more training. (*Id.*) Ms. Hicks believes that a preliminary injunction also would cause confusion among elections officials, poll workers, and voters, especially in jurisdictions that already have held elections using the Photo ID requirement. (*Id.* ¶ 14.)

The Elections Division also is in the process of distributing supplies to local elections officials who will hold elections on November 8, 2005. (A. Hicks Decl. ¶ 13.) According to Ms. Hicks, the Elections Division needs at least one month to process orders for elections supplies and to distribute those supplies. (*Id.*)

As of August 1, 2005, the Elections Division's records indicated that 4,816,904 individuals were registered to vote in Georgia. (A. Hicks Decl. ¶ 15 & Ex. D.)

### G. Testimony of Secretary of State Cox

#### a. Secretary of State Cox's Responsibilities

Secretary of State Cox is Georgia's Secretary of State. (Decl. of Cathy Cox ¶ 2; Oct. 12, 2005, Hr'g Tr.; Dep. of Cathy Cox at 8.) Secretary of State Cox also serves as the Chair of the State Election Board. (Cox Decl. ¶ 2; Oct. 12, 2005, Hr'g Tr.; Cox. Dep. at 9.) The State Election Board consists of five members, including Secretary of State Cox, a representative from the Georgia Democratic Party, a representative from the Georgia Republican Party, a representative from the Georgia Senate, and a representative from the Georgia House of Representatives. (Oct. 12, 2005, Hr'g Tr.) Secretary of State Cox is the principal official in the State Government in charge of elections and for purposes of the Help America Vote Act ("HAVA") and

the National Voter Registration Act. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 9.)

#### b. Reports of Voter Fraud

During the nine years in which Secretary of State Cox has been affiliated with the Secretary of State's Office, that office has not received a report of voter impersonation involving a scenario in which a voter appears at the polls and votes as another person, and the actual person later appears at the polls and attempts to vote as himself. (Cox Decl. ¶ 5; Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 14, 16, 47.) Secretary of State Cox does not dispute that under the previous law, it was possible for the above voter impersonation scenario or another form of in-person voter fraud to occur. (Cox Decl. ¶ 5.)

Further, Secretary of State Cox and her staff are not physically present in all 159 counties and the various municipalities on election days. (Cox Decl. ¶ 5; Oct. 12, 2005, Hr'g Tr.) Secretary of State Cox therefore acknowledges that issues related to in-person voter fraud may arise that are not reported to her office. (Cox Decl. ¶ 5; Oct. 12, 2005, Hr'g Tr.) According to Secretary of State Cox, local election officials are in the best position to know of such incidents. (Cox Decl. ¶ 5; Oct. 12, 2005, Hr'g Tr.)

The State Election Board has received a number of complaints of irregularities with respect to absentee ballots. (Oct. 12, 2005, Hr'g Tr.) In fact, at most of its meetings, the State Election Board discusses complaints of fraud and irregularities in absentee voting. (*Id.*) Secretary of State Cox also is aware of a previous incident in Dodge County, Georgia, involving vote buying and selling of absentee ballots. (*Id.*) The Dodge County incident involved in-person absentee voting. (*Id.*)

According to Secretary of State Cox, Georgia has procedures and practices in place to detect voter fraud. (Oct. 12, 2005, Hr'g Tr.) Those procedures include verifying the voter's correct address, as well as the voter's name, during the check-in process for in-person voters. (*Id.*) Georgia also imposes criminal penalties for voter impersonation. (*Id.*) Most violations of Georgia election laws are punishable as felonies. (*Id.*) No evidence indicates that the criminal penalties do not sufficiently deter in-person voter fraud. (*Id.*)

The integrity of the voter list also is extremely important in preventing voter fraud. (Oct. 12, 2005, Hr'g Tr.) The *Atlanta Journal–Constitution* published an article indicating that Georgia had experienced 5,412 instances of voter fraud during a twenty-year period. (Pls.' Ex. 11; Oct. 12, 2005, Hr'g Tr.) Secretary of State Cox's office undertook an investigation in response to that article. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 40.) The investigation revealed that the specific instance of voter fraud outlined in the *Atlanta Journal–Constitution,* involving a report that Alan J. Mandel had voted after his death, actually did not occur. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 41.) Instead, an individual with a similar name, Alan J. Mandle, had voted at the polls, and the poll worker had marked Alan J. Mandel's name rather than marking Alan J. Mandle, the name of the individual who actually voted. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 41.) Secretary of State Cox's office compared the signature on the voter certificate to the voter registration card of the living individual, and concluded that the living individual, Alan J. Mandle, rather than the deceased Alan J. Mandel, had voted. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 41.)

The Secretary of State's Office subsequently attempted to ensure that voter records were maintained and up to date.

(Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 43.) The Secretary of State's Office sends information concerning dead voters to local elections officials on a monthly basis, and now has the authority to remove the names of deceased voters from the voter rolls if the local elections officials fail to do so in a timely manner. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 43–44.) Secretary of State Cox is not aware of any reports of dead individuals voting since her office received authority to remove the names of deceased individuals from the voter rolls. (Cox Dep. at 45.)

### c. Concerns Regarding HB 244

In her letter to the Georgia State Senate addressing HB 244, Secretary of State Cox expressed concerns that allowing individuals to vote absentee ballots without showing identification and removing the conditions previously required for obtaining absentee ballots opened a gaping opportunity for fraud. (October 12, 2005, Hr'g Tr.; Cox Dep. at 10–12.) Secretary of State Cox indicated that concerns with respect to absentee ballots involved incidents of individuals picking up absentee ballots for other individuals without the required family relationship and individuals removing absentee ballots from voters' mailboxes. (Oct. 12, 2005, Hr'g Tr.) According to Secretary of State Cox, the only restrictions on absentee voting that tended to prevent fraud were the restrictions for obtaining an absentee ballot. (Oct. 12, 2005, Hr'g Tr.)

In her letter to Governor Purdue concerning HB 244, Secretary of State Cox stated her opinion that the Photo ID requirement for in-person voting was unnecessary, created a significant obstacle to voting for many voters, was unlikely to receive preclearance from the Justice Department, violated the Georgia Constitution, and unduly burdened the fundamen-

tal right to vote. (Oct. 12, 2005, Hr'g Tr.; Pls.' Ex. 2; Cox Dep. at 17.) The opinion that Secretary of State Cox expressed in her letter to Governor Purdue remains her personal opinion; however, Secretary of State Cox is obligated to enforce and carry out the Photo ID requirement in her official capacity until the law is declared invalid. (Oct. 12, 2005, Hr'g Tr.)

Secretary of State Cox also requested that Governor Perdue seek the opinion of the Attorney General before approving HB 244. (Oct. 12, 2005, Hr'g Tr.; Pls.' Ex. 2; Cox Dep. at 20.) Secretary of State Cox is not aware that Governor Perdue has sought an opinion from the Attorney General concerning HB 244, and is not aware of any opinion issued by the Attorney General concerning the Photo ID requirement. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 20.)

### d. Voter Registration

Secretary of State Cox is aware of efforts to submit fraudulent voter registrations. (Oct. 12, 2005, Hr'g Tr.) Those efforts occurred both before and after Georgia enacted its Photo ID requirement. (*Id.*)

Georgia currently has no requirement that a person seeking to register to vote present a Photo ID. (Oct. 12, 2005, Hr'g Tr.) HB 244 did not address voter registration. (*Id.*)

In 2004, however, Georgia made some changes to its voter registration law to bring the law into conformity with HAVA. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 26–27.) The law now provides that applicants should provide some type of identification when they register to vote. (Oct. 12, 2005, Hr'g Tr.) That identification may include one of the seventeen forms of identification required for in-person voting prior to July 1, 2005, and need not necessarily be a Photo ID. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 26.) First-time voters who have

registered by mail must provide a Photo ID to vote absentee. (*Id.*) Voters who registered by mail and provided some information concerning their identity, however, are not required to provide a Photo ID to vote absentee. (*Id.*) Additionally, if a voter does not present identification when registering by mail, but the State can verify certain information provided by the voter through a State database, such as the voter's date of birth, the voter need not present a Photo ID to vote absentee. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 26.)

### e. Absentee Ballots and Absentee Voting

HB 244 expanded the opportunity for voters to obtain absentee ballots. (Oct. 12, 2005.) Prior to July 1, 2005, voters seeking to obtain absentee ballots had to aver that they met certain requirements. (*Id.*) After July 1, 2005, those requirements no longer apply for purposes of obtaining absentee ballots. (*Id.*)

To obtain an absentee ballot, a voter must send in a request to the local registrar providing his or her name, address, and an identifying number, or must appear in person at the registrar's office and provide such information. (Oct. 12, 2005, Hr'g Tr.) Local elections officials are supposed to compare the signature on the request to the signature on the voter's registration card. (*Id.*) If the signatures match, the local elections officials will send an absentee ballot to the address listed on the voter's registration. (*Id.*) A voter who wishes to vote an absentee ballot need not provide a Photo ID unless that voter registered by mail, did not provide identification, and is voting for the first time by absentee ballot. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 27.)

After receiving an absentee ballot, the voter must complete the ballot and return

it to the registrar, either by hand-delivery to the registrar's office by the voter or certain relatives of the voter, or by mail. (Oct. 12, 2005, Hr'g Tr.) Even if an absentee ballot contains a postmark indicating that the voter mailed it on an earlier date, elections officials will not count the absentee ballot if the ballot is not received in the registrar's office by 7:00 p.m. on the day of the applicable election. (*Id.*) Exceptions to this rule exist for voters who are members of the military or reside overseas. (*Id.*)

An absentee ballot that arrives in the registrar's office should be returned in two envelopes—an inner blank "privacy" envelope and an outer envelope that contains an oath signed by the voter. (Oct. 12, 2005, Hr'g Tr.) Local elections officials compare the signature on the oath contained on the outer envelope to the signature on the voter's registration card to verify the voter's identity. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 35.) The signature verification procedure is the only safeguard currently in place in Georgia to prevent imposters from voting by using absentee ballots. (Oct. 12, 2005, Hr'g Tr.) The verification process is done manually. (*Id.*) Absentee ballots are submitted to the local registrars' offices over a forty-day period. (*Id.*) However, if fifty percent of voters decided to vote by absentee ballot in any given election, local elections officials would have a difficult time completing the necessary signature verifications. (*Id.*)

Once a voter returns an absentee ballot to the registrar's office, the voter cannot change that ballot. (Oct. 12, 2005, Hr'g Tr.) The voter, however, has the right to notify the registrar that the voter intends to cancel the absentee ballot and vote in person. (*Id.*)

In the November 2004 general election, 422,490, or approximately ten percent, of Georgia's 4,265,333 registered voters voted absentee ballots. (Pls.' Ex. 4 at 1.) 46,734, or approximately seven percent, of Georgia's 697,420 registered African–American female voters voted absentee ballots, as compared with 189,143, or approximately twelve percent, of Georgia's 1,548,916 registered Caucasian female voters. (*Id.*) 26,-144, or approximately six percent, of Georgia's 467,835 registered African–American male voters voted absentee ballots, as compared with 150,722, or approximately eleven percent, of Georgia's 1,376,368 registered Caucasian male voters. (*Id.*)

### f. Signature Comparison for In–Person Voting

Presently, elections officials do not compare signatures on voter certificates of in-person voters to signatures on voter registration cards. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 36–37.) The voter registration cards are not physically present at the polling places. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 36–37.) Secretary of State Cox testified that it would be possible to send voter registration cards to polling places, but that comparing signatures on voter certificates to signatures on voter registration cards for in-person voters would be time-consuming. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 37.)

### g. Voters Without Photo ID

A number of Georgia voters are elderly, have no driver's licenses, and have no need for a state-issued Photo ID card other than for voting purposes. (Oct. 12, 2005, Hr'g Tr.) Further, a number of Georgia voters who are elderly or have low incomes do not have automobiles or use mass transit, and would have difficulty obtaining Photo ID to vote. (*Id.*) Secretary of State Cox does not have information concerning the number of Georgia voters who lack Photo ID. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 23.) Secretary of State Cox also has received no correspondence concerning

significant problems with the new Photo ID requirement or concerning significant numbers of voters who have not been allowed to vote because of the Photo ID requirement. (*Id.*)

An individual who votes in person but does not present a Photo ID may vote a provisional ballot. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 27–28.) Elections officials, however, will not count the provisional ballot unless the voter returns to the registrar's office within forty-eight hours and presents a Photo ID. (Oct. 12, 2005, Hr'g Tr.; Cox Dep. at 27–28.) Secretary of State Cox has no information indicating that voters have cast a significant number of provisional ballots in the elections conducted after the Photo ID requirement received preclearance. (*Id.*)

### h. Training by Elections Division

After the Photo ID requirement received preclearance from the Justice Department, Secretary of State Cox ensured that the Elections Division conducted necessary training, distributed necessary supplies, and did everything possible to ensure that the Photo ID requirement was carried out in every election, including the elections held on August 26, 2005, September 20, 2005, September 27, 2005, and November 8, 2005. (Cox Decl. ¶ 7; Oct. 12, 2005, Hr'g Tr.) The Elections Division also provided information to the public concerning the Photo ID requirement via the website for the Secretary of State's Office and through other public information efforts. (Cox Decl. ¶ 7; Oct. 12, 2005, Hr'g Tr.)

### i. Connection to Local Elections Officials

Local elections officials for counties are connected to the Secretary of State's Office through a mainframe computer. (Oct. 12, 2005, Hr'g Tr.) The Secretary of State's Office has the capability of e-mailing information concerning a preliminary injunction order to the various county elections officials. (*Id.*) The Secretary of State's Office does not have that capacity for municipal elections officials; however, in many cases, county elections officials also manage elections for municipalities within their counties. (*Id.*)

### j. Effect of a Preliminary Injunction

Secretary of State Cox believes that a preliminary injunction precluding Georgia from applying the Photo ID requirement in the November 8, 2005, elections likely would cause confusion for election officials, poll workers, and voters, especially in jurisdictions that already have conducted elections under the new law. (Cox Decl. ¶ 8; Oct. 12, 2005, Hr'g Tr.) Additionally, the Elections Division would have to reprint and distribute new election forms and materials for the jurisdictions conducting November 8, 2005, elections in a very short period of time. (Cox Decl. ¶ 8; Oct. 12, 2005, Hr'g Tr.) Secretary of State Cox anticipates that such a preliminary injunction would result in some local election officials applying the Photo ID requirement, some local election officials applying the former law, and others applying a variation of the laws. (Cox Decl. ¶ 8.)

### H. Procedural Background

On September 19, 2005, Plaintiffs filed this lawsuit. Plaintiffs assert that the Photo ID requirement violates the Georgia Constitution, is a poll tax that violates the Twenty-fourth Amendment and the Equal Protection Clause, unduly burdens the fundamental right to vote, violates the Civil Rights Act of 1964, and violates Section 2 of the Voting Rights Act.

On September 19, 2005, Plaintiffs requested that the Court schedule a preliminary injunction hearing. On that same day, the Court entered an Order schedul-

ing a preliminary injunction hearing for October 12, 2005. (Order of Sept. 19, 2005.)

On October 6, 2005, Plaintiffs filed a formal Motion for Preliminary Injunction. On October 7, 2005, Secretary of State Cox filed a Motion to Dismiss Individual Capacity Claims. On October 11, 2005, individual Plaintiff Tony Watkins filed a Stipulation of Dismissal Without Prejudice of his claims. Finally, on October 12, 2005, Plaintiffs filed their First Amendment to Complaint, which addresses the issue of standing for the organizational Plaintiffs.

On October 12, 2005, the Court held a hearing with respect to Plaintiffs' Motion for Preliminary Injunction. During the October 12, 2005, hearing, the parties presented evidence and arguments in support of their respective positions. The Court concludes that the Motion for Preliminary Injunction now is ripe for resolution by the Court.

## II. Standing

Defendants argue that Plaintiffs lack standing to pursue this lawsuit. The Court addresses the issue of standing before turning to the merits of Plaintiffs' Motion for Preliminary Injunction.

Article III of the federal Constitution limits the power of federal courts to adjudicating actual "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. "The most significant case-or-controversy doctrine is the requirement of standing." *Nat'l Alliance for Mentally Ill, St. Johns Inc. v. Bd. of County Comm'r's*, 376 F.3d 1292, 1294 (11th Cir.2004). " 'In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.' " *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

■ The party invoking federal jurisdiction has the burden of proving standing. *Nat'l Alliance for the Mentally Ill*, 376 F.3d at 1294. At least three different types of standing exist: taxpayer standing, individual standing, and organizational standing. *Id.* To establish those types of standing, a plaintiff must " 'demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.' " *Id.* at 1295 (citing *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)) (internal quotation marks omitted). For purposes of this Order, the Court focuses on whether the organizational Plaintiffs have standing to pursue this action.[2]

■ " 'An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " *Nat'l Alliance for the Mentally Ill*, 376 F.3d at 1296 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693,

---

2. One of the individual Plaintiffs, Tony Watkins, dismissed his claims without prejudice prior to the October 12, 2005, hearing, apparently because he did not wish to submit to a deposition. Defendants argue that the remaining individual Plaintiff, Clara Williams, lacks standing because she has a MARTA card that would qualify as a Photo ID card under the new Photo ID requirement and because she could vote by absentee ballot. In light of the need to issue a ruling quickly, and in light of the Court's decision *infra* concerning Plaintiffs' Section 2 claims, the Court does not address Defendants' arguments pertaining to Plaintiff Williams at this point.

704, 145 L.Ed.2d 610 (2000)). Here, Plaintiffs' First Amendment to Complaint adds a new paragraph 1(i) to their Complaint that states:

> Common Cause, the League, the Central Presbyterian and Advocacy Center, Inc., Georgia Association of Black Elected Officials, Inc., The National Association for the Advancement of Colored People (NAACP), Inc., GLBC, and the Concerned Black Clergy of Metropolitan Atlanta, Inc., (in the aggregate, the "Non-Profit Plaintiffs"), are non-profit organizations composed of members who would have standing to sue in their individual right for the allegations set forth in the Complaint, the interests which each of the Non-Profit Plaintiffs and their members seek to protect in the Complaint are germane to the purpose of each of the Non-Profit Plaintiffs, and neither the claim or the relief sought requires participation by the individual members of the Non-Profit Plaintiffs.

(First Am. to Compl.) The Court concludes that Plaintiffs' allegations satisfy the organizational standing requirements, for purposes of Plaintiffs' Motion for Preliminary Injunction.

### III. Plaintiffs' Motion for Preliminary Injunction

To obtain a preliminary injunction, a movant must show: (1) a substantial likelihood of ultimate success on the merits; (2) the preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the preliminary injunction would inflict on the non-movant; and (4) the preliminary injunction would serve the public interest. *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998). In the Eleventh Circuit, " '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to

the four requisites." *Id.* (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir. 1989)) (internal quotation marks omitted) (alterations in original).

A plaintiff seeking to enjoin enforcement of a state statute bears a particularly heavy burden. " '[P]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.' " *Bankwest, Inc. v. Baker,* 324 F.Supp.2d 1333, 1343 (N.D.Ga.2004) (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990)).

### A. Substantial Likelihood of Success on the Merits

### 1. Claims Under the Georgia Constitution

Plaintiffs allege that the Photo ID requirement violates article II, section 1, paragraph 2 of the Georgia Constitution. Article II, section 1, paragraph 2 of the Georgia Constitution provides: "Every person who is a citizen of the United States and a resident of Georgia as defined by law, who is at least 18 years of age and not disenfranchised by this article, and who meets minimum residency requirements as provided by law shall be entitled to vote at any election by the people. The General Assembly shall provide by law for the registration of electors." Ga. Const. art. II, § 1, ¶ 2. Article II, section 1, paragraph 3 of the Georgia Constitution sets forth the following exceptions to the right to register to vote:

(a) No person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence. (b) No person who has been judicially determined to be mentally incompetent may register, remain registered, or vote unless the disability has been removed.

Ga. Const. art. II, § 1, ¶ 3.

Plaintiffs argue that the new Photo ID requirement violates the Georgia Constitution because it denies certain Georgia citizens the right to vote. According to Plaintiffs, the Georgia Constitution lists only two grounds for denying a Georgia citizen who is registered to vote the right to vote: (1) having a conviction for a felony involving moral turpitude; or (2) having a judicial determination of being mentally incompetent to vote. Plaintiffs contend that the Georgia legislature simply has no power to regulate voting outside the areas of defining residency and establishing registration requirements.

Defendants argue that any claim that the State Defendants are violating Georgia law is barred by the Eleventh Amendment. Defendants quote *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), for the proposition that the Eleventh Amendment bars federal courts from enforcing state law either prospectively or retroactively. According to Defendants, because Georgia state courts are the correct arbiters on the meaning of state law, "it would be a 'gross intrusion'" for this Court to grant a preliminary injunction on the basis of Plaintiffs' claims arising under the Georgia Constitution claims. (State Defs.' Br. Opp'n Pls.' Mot. Prelim. Inj. at 56.)

Defendants also argue that even if Eleventh Amendment immunity does not exist, Plaintiffs cannot succeed because the constitutionality of a Georgia statute is presumed, and " 'all doubts must be resolved in favor of its validity.' " (*Id.* at 57 (citations omitted).) According to Defendants, the General Assembly did not prescribe qualifications for voters when enacting the Photo ID law; instead, they were attempting to regulate the voting process itself. Defendant argue that the in-person Photo ID requirement is a "time, place, or manner" regulation, and that the Georgia Constitution does not require that citizens be permitted to vote in person nor does it state that citizens have an absolute right to be free from any regulation of in-person voting. (*Id.* at 59.)

Before the Court can consider Plaintiffs' claims regarding the Georgia Constitution, the Court must determine whether the Eleventh Amendment to the United States Constitution bars those claims. *McClendon v. Ga. Dept. of Cmty. Health,* 261 F.3d 1252, 1257 (11th Cir.2001); *Silver v. Baggiano,* 804 F.2d 1211, 1213 (11th Cir.1986).

The Eleventh Amendment to the Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has made clear that this language also bars suits against a state by its own citizens. *DeKalb County School Dist. v. Schrenko* 109 F.3d 680, 687 (1997) (citing *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). "In short, the Eleventh Amendment constitutes an 'absolute bar' to a state's being sued by its own citizens, among others." *Id.* (citing *Principality of Monaco v. Mississippi,* 292 U.S. 313, 329, 54 S.Ct. 745, 78 L.Ed. 1282 (1934)).

▌ "[A]bsent its consent, a state may not be sued in federal court unless Congress has clearly and unequivocally ab-

rogated the state's Eleventh Amendment immunity by exercising its power with respect to rights protected by the Fourteenth Amendment." *Id.* at 688 (quoting *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II "*)). "Congress may not nullify a state's immunity with respect to alleged violations of state law." *Id.* "For that reason, a federal court may not entertain a cause of action against a state for alleged violations of state law, even if that state claim is pendent to a federal claim which the district court could adjudicate." *Id.* (citing *Pennhurst II,* 465 U.S. at 117–23, 104 S.Ct. 900). In *Pennhurst II,* the United States Supreme Court explained that:

[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Pennhurst II,* 465 U.S. at 106, 104 S.Ct. 900.

■ Because Plaintiffs' suit is against State officials, rather than the State itself, a question arises as to whether the suit is actually a suit against the State of Georgia. "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.' " *Id.* at 101, 104 S.Ct. 900 (quoting *Ford Motor Co. v. Dept. of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)). A state is the real party in interest when the judgment sought would "restrain the Government from acting, or compel it to act." *Id.* at 101 n. 11, 104 S.Ct. 900 (quoting *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)) (internal quotation marks and citations omitted).

■ The injunction Plaintiffs seek here would restrain the State from attempting to enforce the Photo ID requirement imposed by HB 244. The Court therefore finds that the State of Georgia is the real party in interest. Further, the Court finds that Plaintiffs' claim—that the Act violates two sections of the Georgia Constitution—clearly is a cause of action against a state for alleged violations of state law. The Court therefore concludes that this portion of Plaintiffs' Complaint is barred by the Eleventh Amendment.[3]

For the reasons discussed above, the Eleventh Amendment precludes the Court from entertaining Plaintiffs' claims asserted under the Georgia Constitution. The Court therefore concludes that Plaintiffs have failed to show a substantial likelihood

---

**3.** The Court notes that Plaintiffs' claims under the Georgia Constitution do not fall within the *Ex Parte Young* exception to the States' Eleventh Amendment immunity from suit. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The *Young* doctrine, as interpreted by later Supreme Court cases, provides that a suit for prospective relief that challenges a state official's conduct as being contrary to the supreme authority of the United States is not a suit against the State and therefore is not barred by the Eleventh Amendment. *Pennhurst,* 465 U.S. at 102, 104 S.Ct. 900 (citing *Young,* 209 U.S. at 160, 28 S.Ct. 441; *Edelman v. Jordan,* 415 U.S. 651, 666–67, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). Plaintiffs' claims under the Georgia Constitution, which challenge the enforcement of a state law as being contrary to a state constitution, do not implicate the supreme authority of the United States. Therefore, the *Young* exception to the Eleventh Amendment's bar on suits against a State does not apply to allow the Court to consider those claims.

of success with respect to those claims.[4]

## 2. Undue Burden on the Right to Vote

The Supreme Court has made it clear that voting is a fundamental right, *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), under the Fourteenth Amendment in the context of equal protection, *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 629, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Indeed, in *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court observed:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

376 U.S. at 17–18, 84 S.Ct. 526. Similarly, in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Court stated:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

377 U.S. at 561–62, 84 S.Ct. 1362.

■ "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). The equal right to vote, however, is not absolute. *Id.* at 336, 92 S.Ct. 995. Instead, states can impose voter qualifications and can regulate access to voting in other ways. *Id.* at 336, 92 S.Ct. 995. Under the United States Constitution, states may establish the time, place, and manner of holding elections for Senators and Representatives. U.S. Const. art. I, § 4, cl. 1. Those qualifications and access regulations, however, cannot unduly burden or abridge the right to vote. *Tashjian,* 479 U.S. at 217, 107 S.Ct. 544 ("[T]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote.") (citing *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)); *Dunn,* 405 U.S. at 359–60, 92 S.Ct. 995 (striking down Tennessee's durational residency requirement for voting of one year in state and three months in county); *Beare v. Briscoe,* 498 F.2d 244, 247–48 (5th Cir.1974) (invalidating provisions of Texas Constitution and implementing statute requiring persons who wished to vote in any given year to register each year during registration period beginning on October 1 and ending on January 31 of following year) (per curiam). In particular, the Supreme Court has observed that the wealth or the ability to pay a fee is not a valid qualification for voting. *Harper v. Va. State Bd., of Elections,* 383 U.S. 663, 666–68, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (citations omitted; footnote omitted).

A number of Supreme Court cases have set forth standards for determining whether a state statute or regulation concerning voting violates the Equal Protection

4. The Court will not dismiss Plaintiffs' claims arising under the Georgia Constitution in this Order because the case is not before the Court on a motion to dismiss those claims. The Court will address Secretary of State Cox's Motion to Dismiss Individual Capacity Claims in a separate Order to be issued at a later date.

clause. In *Dunn,* the Supreme Court stated that a court must examine: "the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn,* 405 U.S. at 335, 92 S.Ct. 995. Another Supreme Court case indicates that the Court should " 'consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' " *Kramer,* 395 U.S. at 626, 89 S.Ct. 1886. Those cases apply strict scrutiny when examining state statutes or regulations that limit the right to vote. *Id.* at 627, 89 S.Ct. 1886 ("[I]f a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." ); *see also Hill v. Stone,* 421 U.S. 289, 298, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975) ("in an election of general interest, restrictions on the franchise of any character must meet a stringent test of justification").

In a more recent line of cases, the Supreme Court has not necessarily applied the strict scrutiny test automatically to regulations that relate to voting. *Burdick,* 504 U.S. at 433–34, 112 S.Ct. 2059; *Tashjian v. Republican Party,* 479 U.S. 208, 213, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)). Indeed, the Supreme Court observed in *Burdick:*

> Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects-at least to some

degree-the individual's right to vote and his right to associate with others for political ends." Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.

> Accordingly, the mere fact that a State's system "creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny."

> Instead, ... a more flexible standard applies. A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's most important regulatory interests are generally sufficient to justify" the restrictions.

*Burdick,* 504 U.S. at 433–34, 112 S.Ct. 2059 (citations omitted).

Defendants argue that the Photo ID requirement simply regulates the manner of voting, and that requiring a Photo ID for in-person voting is a reasonable means of achieving the legitimate state interest of regulating voting and preventing in-person vote fraud. According to Defendants, the Photo ID requirement is not a severe restriction on voting because it prevents no one from voting. Defendants argue that anyone may vote by absentee ballot under HB 244's more relaxed absentee voting requirements. Defendants state that even voters who register by mail may vote for the first time via absentee ballot without showing a Photo ID, and that such voters simply must include a utility bill, a bank statement, or other form of identification permitted by HAVA with their absentee ballots as a means of voter identification. (Oct. 12, 2005, Hr'g Tr.)

According to Defendants, at most, the Photo ID requirement prevents some individuals who wish to vote in person from doing so until they obtain proper identification. Defendants also contend that those individuals without a Photo ID may obtain one free of charge from a State DDS Office, the State's GLOW Bus, or through certain organizations serving indigent clients merely by completing an Affidavit for Identification Card for Voting Purposes ("Affidavit"). Defendants note that although the Affidavit requires the applicant "to swear[ ] under oath that he or she is indigent and cannot pay the fee," (State Defs.' Initial Br. Opp'n Pls.' Mot. Prelim. Inj. at 48), anyone who desires a non-driver Photo ID card for voting purposes may complete the form and receive the free Photo ID card (Watson Decl. ¶ 5).

Defendants also point out that although opportunities for voter fraud via absentee ballot may exist, the legislature may address one method of voting at a time. In this case, the legislature has chosen to address voting fraud via in-person voting first.

### a. Under Strict Scrutiny

■ There seems to be little doubt that the Photo ID requirement fails the strict scrutiny test: accepting that preventing voter fraud is a legitimate and important State concern, the statute is not narrowly drawn to prevent voter fraud. Indeed, Secretary of State Cox pointed out that, to her knowledge, the State had not experienced one complaint of in-person fraudulent voting during her tenure. In contrast, Secretary of State Cox indicated that the State Election Board had received numerous complaints of voter fraud in the area of absentee voting. Furthermore, the Secretary of State's Office removes deceased voters from the voting rolls monthly, eliminating the potential for voter fraud noted by the *Atlanta Journal–Constitution's* article alleging that more than 5,000 deceased people voted during a twenty-year period.

Further, although Defendants have presented evidence from elections officials of fraud in the area of voting, all of that evidence addresses fraud in the area of voter registration, rather than in-person voting. The Photo ID requirement does not apply to voter registration, and any Georgia citizen of appropriate age may register to vote without showing a Photo ID. Indeed, individuals may register to vote by producing copies of bank statements or utility bills, or without even producing identification at all. The Photo ID law thus does nothing to address the voter fraud issues that conceivably exist in Georgia.

Rather than drawing the Photo ID law narrowly to attempt to prevent the most prevalent type of voter fraud, the State

drafted its Photo ID requirement to apply only to in-person voters and to apply only to absentee voters who had registered to vote by mail without providing identification who were voting absentee for the first time. By doing so, the State, in theory, left the field wide open for voter fraud by absentee voting. Under those circumstances, the Photo ID requirement simply is not narrowly tailored to serve its stated purposes—preventing voter fraud. *See Dunn,* 405 U.S. at 343, 92 S.Ct. 995 ("Statutes affecting constitutional rights must be drawn with 'precision,' and must be 'tailored to serve their legitimate objectives. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'") (citations omitted). Further, the State has a number of significantly less burdensome alternatives available to prevent in-person voting fraud, such as the voter identification requirements it previously used and numerous criminal statutes penalizing voter fraud, to discourage voters from fraudulently casting ballots or impersonating other voters.

For the reasons discussed above, the Court finds that the Photo ID requirement is not narrowly tailored to serve the State's interest in preventing voter fraud, and that a number of significantly less burdensome alternatives exist to address the State's interest. Consequently, the Court concludes that Plaintiffs have a substantial likelihood of succeeding on the merits of their Equal Protection Clause claim under a strict scrutiny analysis.

**b. Under *Burdick***

Even if the Court applies the *Burdick* test, Plaintiffs still have a substantial likelihood of succeeding on the merits of their Equal Protection Clause claim. Specifically, "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" outweighs "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick,* 504 U.S. at 433–34, 112 S.Ct. 2059.

**i. The Asserted Injury**

For the reasons discussed below, the Court concludes that the character and magnitude of the asserted injury to the right to vote is significant. Many voters who do not have driver's licenses, passports, or other forms of photographic identification have no transportation to a DDS service center, have impairments that preclude them from waiting in often-lengthy lines to obtain licenses, or cannot travel to a DDS service center during the DDS's hours of operation because the voters cannot take off time from work. It is beyond dispute that the DDS service centers, particularly those in suburban areas near Atlanta, frequently have lengthy lines, and that obtaining a driver's license or Photo ID at a DDS service center often may require several hours of one's time. Many voters who are elderly, disabled, or have certain physical or mental problems simply cannot navigate the lengthy wait successfully—even if the DDS allows those voters to sit and wait until a DDS worker calls their numbers.

Further, DDS service centers are not located in every Georgia county. Some of the service centers, particularly in south and middle Georgia, are so widely spaced that the service centers may be a lengthy drive away from many of the citizens those centers service. Most of the DDS service

centers are located in largely rural areas where mass transit likely is not available, and registered voters who have no need for a driver's license but do not have another form of Photo ID simply may not be able to obtain transportation to a DDS service center.

The Court acknowledges that the DDS has a mobile licensing unit, the GLOW bus. The fact remains, however, that the DDS has only one GLOW bus and Georgia has 159 counties. It therefore is not reasonable to expect that the GLOW bus can travel to all of Georgia's counties and the communities contained within those counties to service a significant number of voters who lack Photo IDs prior to the November 8, 2005, elections. Further, unless some effort is made to notify the public that the GLOW bus will be in a particular area on a particular date, many voters simply would not know of the GLOW bus alternative or would not be able to make arrangements for transportation to take them to the GLOW bus. As Plaintiffs' evidence indicates, even calling the DDS to request information concerning the GLOW bus's schedule of appearances may result in a voter receiving inconsistent information.

In any event, Plaintiffs have presented evidence indicating that the GLOW bus has steps for entering the bus and is not wheelchair-accessible. Many of the voters who do not possess Photo IDs are elderly or disabled and are wheelchair-bound or have difficulty walking or navigating steps. The GLOW bus simply is not a feasible alternative for those voters, as the voters cannot enter the GLOW bus and the GLOW bus's photographic and computer equipment apparently cannot be moved outside the bus to service the voters.

Still other voters do not have the $20 or $35 to pay for a Photo ID card, although they may not qualify as "indigent" for purposes of the fee waiver provision. Although Defendants contend that any voter who needs a Photo ID card for voting and who does not have another form of Photo ID may obtain a Photo ID card for free simply by completing an Affidavit, which the DDS does not question, the evidence fails to indicate that the State has made efforts to publicize the DDS's "no questions asked" policy to voters or that DDS employees tell DDS customers that policy. The Affidavit requires a voter to sign the following statement:

I hereby swear or affirm that I am eligible for a free identification card for voting purposes pursuant to O.C.G.A. § 40–5–103(d). I am eligible for this card because:

1. I am indigent and cannot pay the fee for an identification card;

2. I desire an identification card in order to vote in a primary or election in Georgia;

3. I do not have any other form of identification that is acceptable under O.C.G.A. § 21–2–417 for identification at the polls in order to vote;

4. I am registered to vote in Georgia or I am applying to register to vote as part of my application for an identification card; and

5. I do not have a valid driver's license issued by the State of Georgia.

A voter who reads the Affidavit without knowing the DDS's "no questions asked" policy most likely would believe that he or she actually must be indigent and lack funds to pay for an Photo ID card before he or she could obtain a card for free. Such a voter might not even bother completing the Affidavit, for fear that signing a statement under oath that is not true and submitting the Affidavit to a State agency would result in penalties. Thus, the availability of free Photo ID cards

simply does not reduce the burden that the Photo ID requirement imposes on the right to vote.[5]

The State Defendants argue that the Photo ID requirement does not deprive voters of the right to vote, as voters can vote via absentee ballot without producing any Photo ID at all in most instances. Most voters, however, likely are unaware that they can vote via absentee ballot without a Photo ID, and the State has not demonstrated that it has publicized the fact that a Photo ID is not necessary to vote via absentee ballot.

Further, HB 244 also changed the law governing absentee voting to eliminate the conditions previously required for obtaining an absentee ballot, which had been in effect for some time. Counsel for the State Defendants, in response to the Court's question concerning publication of the new absentee voting requirements, stated that the State has not publicized the new requirements for absentee voting any more or less than the State publicizes any other change in election law. Secretary of State Cox testified that the absentee voting rules in effect prior to the passage of HB 244 required voters to aver that they met one of several specified requirements to obtain an absentee ballot. Absent more information indicating that the State made an effort to inform Georgia voters concerning the new, relaxed absentee voting procedures, many Georgia voters simply may be unaware that the rules have changed. Those voters therefore still may believe that they must satisfy one of the former requirements to obtain an absentee ballot. Voters who cannot satisfy the former requirements likely will not even attempt to obtain an absentee ballot. Consequently, the Court simply cannot assume that Georgia voters who do not have a Photo ID will make the arrangements necessary to vote via the absentee voting process.

In any event, as Secretary of State Cox pointed out, an absentee ballot is only counted if it is received by the registrar in the voter's jurisdiction by 7:00 p.m. the day of the elections. Even absentee ballots postmarked by that date but delivered after 7:00 p.m. on election day are not counted. The only method voters have of ensuring that their vote is counted is to show up at their polling precinct on election day and vote in person or to hand-deliver their absentee ballot to the registrar in their jurisdiction before 7:00 p.m. on election day.[6]

The absentee voting process also requires that voters plan sufficiently enough ahead to request an absentee ballot, to have the ballot delivered from the registrar's office via the United States Postal Service, to complete the ballot successfully, and to mail the absentee ballot to the registrar's office sufficiently early to allow the United States Postal Service to deliver the absentee ballot to the registrar by 7:00 p.m. on election day. The majority of voters—particularly those voters who lack Photo ID—would not plan sufficiently

---

5. In any event, the Court finds it ironic that the State seeks to prevent one type of lying—fraudulent in-person voting—yet the State points to a DDS policy that apparently allows voters who want Photo ID cards to "lie" about their financial status as support for its argument that the Photo ID requirement does not unduly burden the right to vote.

6. The second method assumes voters know that they may hand-deliver absentee ballots and that voters know where to deliver those ballots. Many voters simply may believe that they can hand-deliver their absentee ballots to a polling place, which is not a viable alternative. Furthermore, many absentee voters do not drive or otherwise lack transportation. Although many organizations provide free transportation to the polls on election day, the availability of free transportation to the registrar's office likely is limited or nonexistent.

enough ahead to vote via absentee ballot successfully. In fact, most voters likely would not be giving serious consideration to the election or to the candidates until shortly before the election itself. Under those circumstances, it simply is unrealistic to expect that most of the voters who lack Photo IDs will take advantage of the opportunity to vote an absentee ballot.

For the reasons discussed above, the Court finds that absentee voting simply is not a realistic alternative to voting in person that is reasonably available for most voters who lack Photo ID. The fact that voters, in theory, may have the alternative of voting an absentee ballot without a Photo ID thus does not relieve the burden on the right to vote caused by the Photo ID requirement.[7]

Additionally, the State argues that voters who do not have Photo ID will not be "turned away" from the polls; rather, those voters may vote a provisional ballot and return within forty-eight hours with a Photo ID. In support of this argument, the State points to the September 20, 2005, special election in Richmond County, where thirteen people without a Photo ID voted via provisional ballot and only two of those individuals returned with a Photo ID within the requisite forty-eight hour period to verify their identity and have their ballots counted. Given the difficulty of obtaining a Photo ID discussed above, it is highly unlikely that many of the voters who lack Photo ID and who would vote via

provisional ballots could obtain a Photo ID card within the forty-eight hour period. Indeed, although many organizations are more than happy to transport individuals to polling places on election day, it is unlikely that those organizations or any other organization or individual would be able or willing to provide transportation to DDS service centers to allow voters of provisional ballots to obtain Photo ID cards. The ability to vote a provisional ballot thus is an illusion. Further, many voters may not even attempt to vote a provisional ballot in person because they do not have a Photo ID, and they believe that they cannot make the necessary arrangements to obtain a Photo ID within forty-eight hours after casting their votes.

The right to vote is a delicate franchise. Indeed, the Court notes that Plaintiff Watkins declined to pursue his claim when he was informed that Defendants planned to depose him.[8] Given the fragile nature of the right to vote, and the restrictions discussed above, the Court finds that the Photo ID requirement imposes "severe" restrictions on the right to vote. In particular, the Photo ID requirement makes the exercise of the fundamental right to vote extremely difficult for voters currently without acceptable forms of Photo ID for whom obtaining a Photo ID would be a hardship. Unfortunately, the Photo ID requirement is most likely to prevent Georgia's elderly, poor, and African-American voters from voting. For those citi-

---

7. Defendants argue that no constitutional right to vote in person exists, citing Oregon's policy of having elections conducted entirely by mail. Oregon's voting by mail structure differs significantly from Georgia's voting procedures. One major difference between Georgia's Photo ID requirement and Oregon's policy of conducting mail elections that is particularly noteworthy is that Oregon's policy places the same burden on every voter. Here, Georgia's Photo ID requirement places the burden of voting absentee on the very

class of voters who will be least likely to navigate that method of voting successfully.

8. Counsel for Plaintiff Watkins indicated during an October 5, 2005, telephone conference with the Court that Plaintiff Watkins likely would choose not to participate in this litigation if the Court did not grant a request for a protective order to prevent Defendants from deposing him.

zens, the character and magnitude of their injury—the loss of their right to vote—is undeniably demoralizing and extreme, as those citizens are likely to have no other realistic or effective means of protecting their rights.

### ii. State Interest

The State and the State Defendants assert that the Photo ID requirement is designed to curb voting fraud. Undoubtedly, this interest is an important one. Unfortunately, the fact that the interest asserted is important and is legitimate does not end the Court's inquiry.

### iii. Extent to Which the State's Interest In Preventing Voter Fraud Makes It Necessary to Burden the Right to Vote

Finally, the Court must examine the extent to which the State's interest in preventing voter fraud makes it necessary to burden the right to vote. As discussed above, the Photo ID requirement is not narrowly tailored to the State's proffered interest of preventing voter fraud, and likely is not rationally based on that interest. Secretary of State Cox testified that her office has not received even one complaint of in-person voter fraud over the past eight years and that the possibility of someone voting under the name of a deceased person has been addressed by her Office's monthly removal of recently deceased persons from the voter roles. Further, the Photo ID requirement does absolutely nothing to preclude or reduce the possibility for the particular types of voting fraud that are indicated by the evidence: voter fraud in absentee voting, and fraudulent voter registrations. The State imposes no Photo ID requirement or absolute identification requirement for registering to vote, and has removed the conditions for obtaining an absentee ballot

imposed by the previous law. In short, HB 244 opened the door wide to fraudulent voting via absentee ballots. Under those circumstances, the State Defendants' proffered interest simply does not justify the severe burden that the Photo ID requirement places on the right to vote. For those reasons, the Court concludes that the Photo ID requirement fails even the *Burdick* test.

### c. Summary

For the reasons discussed above, the Court finds that under either the strict scrutiny or *Burdick* test, Plaintiffs have a substantial likelihood of succeeding on the merits of their claim that the Photo ID requirement unduly burdens the right to vote. Consequently, this factor counsels in favor of granting a preliminary injunction.

### 3. Poll Tax

Plaintiffs next argue that the Photo ID requirement imposes a poll tax on Georgia voters. Plaintiffs point out that voters who do not have a Georgia driver's license, a passport, or another valid form of Government-issued identification must pay $20 to obtain a five-year Photo ID card or $35 to obtain a ten-year Photo ID card. Plaintiffs contend that even though the Photo ID requirement does not use the term "poll tax," the fee for the Photo ID card is a tax and is not a user fee. Even if the Photo ID card fee is not a tax as defined under Georgia law, Plaintiffs contend that the State cannot evade the requirements of the Fourteenth and Twenty–Fourth Amendments by labeling something as a "fee" when, in reality, it is a tax on the right to vote.

The Twenty–Fourth Amendment to the United States Constitution provides: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors

for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV. The Twenty–Fourth Amendment thus applies to elections for certain federal officials.

Plaintiffs contend that the $20 fee for a five-year Photo ID card or the $35 fee for a ten-year Photo ID is a poll tax because voters who do not have other acceptable forms of Photo ID must obtain the Photo ID card to cast their votes in person at the polls. Although Defendants point out that the DDS can waive the Photo ID card fee for voting under certain circumstances, Plaintiffs argue that this fee waiver provision is illusory. In any event, Plaintiffs argue that the possibility that a small number of voters can avoid paying the cost for a Photo ID card does not make the Photo ID scheme constitutionally permissible; it still places a burden on the right to vote.

For the following reasons, the Court finds that Plaintiffs have a substantial likelihood of success on their poll tax claim. In *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), the Supreme Court struck down a Virginia requirement that a federal voter either pay the customary poll taxes as required for state elections or file a certificate of residence. The Supreme Court reasoned that the requirement to file a certificate of residence imposed a material requirement solely upon those who refused to surrender their right to vote in federal elections without paying the poll tax, and, consequently, the requirement violated the Twenty–Fourth Amendment. 380 U.S. at 541–42, 85 S.Ct. 1177. The Supreme Court stated:

It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. "Constitutional rights would be of little value if they could be ... indirectly denied," or "manipulated out of existence." Significantly, the Twenty-fourth Amendment does not merely insure that the franchise shall not be "denied" by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be "denied or abridged" for that reason. Thus, like the Fifteenth Amendment, the Twenty-fourth "nullifies sophisticated as well as simple-minded modes" of impairing the right guaranteed. "It hits onerous procedural requirements which effectively handicap exercise of the franchise" by those claiming the constitutional immunity.

Thus, in order to demonstrate the invalidity of § 24–17.2 of the Virginia Code, it need only be shown that it imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax. Section 24–17.2 unquestionably erects a real obstacle to voting in federal elections for those who assert their constitutional exemption from the poll tax. As previously indicated, the requirement for those who wish to participate in federal elections without paying the poll tax is that they file in each election year, within a stated interval ending six months before the election, a notarized or witnessed certificate attesting that they have been continuous residents of the State since the date of registration (which might have been many years before under Virginia's system of permanent registration) and that they do not presently intend to leave the city or county in which they reside prior to the forthcoming election. Unlike the poll tax bill which is sent to the voter's residence, it is not entirely clear how one obtains the

necessary certificate.... This is plainly a cumbersome procedure. In effect, it amounts to annual re-registration which Virginia officials have sharply contrasted with the "simple" poll tax system. For many, it would probably seem far preferable to mail in the poll tax payment upon receipt of the bill. In addition, the certificate must be filed six months before the election, thus perpetuating one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate. We are thus constrained to hold that the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgement of his right to vote by reason of failure to pay the poll tax. The requirement imposed upon those who reject the poll tax method of qualifying would not be saved even if it could be said that it is no more onerous, or even somewhat less onerous, than the poll tax. For federal elections, the poll tax is abolished absolutely as a prerequisite to voting, and no equivalent or milder substitute may be imposed. Any material requirement imposed upon the federal voter solely because of his refusal to waive the constitutional immunity subverts the effectiveness of the Twenty-fourth Amendment and must fall under its ban.

380 U.S. at 540–42, 85 S.Ct. 1177 (citations omitted; footnote omitted).

Similarly, in *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Supreme Court struck down Virginia's poll tax requirement for state elections, finding that the poll tax violated the Equal Protection Clause. The Court stated:

We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax. Our cases demonstrate that the Equal Protection Clause of the Fourteenth Amendment restrains the States from fixing voter qualifications which invidiously discriminate. Thus without questioning the power of a State to impose reasonable residence restrictions on the availability of the ballot, we held ... that a State may not deny the opportunity to vote to a bona fide resident merely because he is a member of the armed services... Previously we had said that neither homesite nor occupation "affords a permissible basis for distinguishing between qualified voters within the State." We think the same must be true of requirements of wealth or affluence or payment of a fee.

383 U.S. at 666–67, 86 S.Ct. 1079 (citations omitted). The Court further observed:

[W]e must remember that the interest of the State, when it comes to voting, is limited to the power to fix qualifications. Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the basis of wealth or property, like those of race, are traditionally disfavored. To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor. The degree of the discrimination is irrelevant. In this context-that is, as a condition of obtaining a ballot-the requirement of fee paying causes an "invidious" discrimination that runs afoul of the Equal Protection Clause.

*Id.* at 668, 86 S.Ct. 1079.

After the enactment of the Photo ID requirement, voters who do not have other acceptable forms of Photo ID must obtain Photo ID cards to be able to vote in person

at the polls. Voters who choose not to obtain Photo ID cards, or who are unable to obtain Photo ID cards for one reason or another, are free to vote via absentee ballot. As discussed *supra* Part III.A.2., however, absentee voting is unavailable to many voters who do not have forms of Photo ID—either because those voters are unaware of their eligibility to vote via absentee ballot or because the voters are unable to navigate the absentee voting process successfully. As a practical matter, therefore, the majority of voters who do not have other acceptable forms of Photo ID must obtain a Photo ID card to cast their votes successfully and to ensure that their votes will be counted.

The fee for a Photo ID card is $20 for a five-year card and $35 for a ten-year card. Because, as a practical matter, most voters who do not possess other forms of Photo ID must obtain a Photo ID card to exercise their right to vote, even though those voters have no other need for a Photo ID card, requiring those voters to purchase a Photo ID card effectively places a cost on the right to vote. In that respect, the Photo ID requirement runs afoul of the Twenty-fourth Amendment for federal elections and violates the Equal Protection Clause for State and municipal elections.[9]

Defendants argue that the DDS service centers will waive the fee for a Photo ID card if a voter who does not have another acceptable form of Photo ID needs the Photo ID card for voting purposes and if the voter completes an Affidavit. The Affidavit requires the voter to sign the following statement:

I hereby swear or affirm that I am eligible for a free identification card for voting purposes pursuant to O.C.G.A. § 40–5–103(d). I am eligible for this card because:

1. I am indigent and cannot pay the fee for an identification card;

2. I desire an identification card in order to vote in a primary or election in Georgia;

3. I do not have any other form of identification that is acceptable under O.C.G.A. § 21–2–417 for identification at the polls in order to vote;

4. I am registered to vote in Georgia or I am applying to register to vote as part of my application for an identification card; and

5. I do not have a valid driver's license issued by the State of Georgia.

(Watson Decl. Ex. A.) The DDS, however, instructs its employees not to investigate the truth of the representations made by voters who complete the Affidavit. Instead, DDS employees are to issue a Photo ID card to any voter who completes the Affidavit, without asking any questions. As discussed *supra* Part III.A.2., however, many voters may not be aware of that policy, and understandably may be reluctant to sign an Affidavit that requires them to state that they are "indigent and cannot pay the fee for an identification card" when such a statement is not true. Additionally, many voters simply may be too embarrassed over their inability to afford a Photo ID card to request and complete an Affidavit for a free card. Berry, *supra* note 9, at 307. Consequently, very

**9.** *See* John Victor Berry, *Take the Money and Run: Lame–Ducks "Quack" and Pass Voter Identification Provisions,* 74 U. Det. Mercy L.Rev. 291, 304, 314 (1997) (noting that "[t]he Attorney General of Michigan made the observation [with respect to a Michigan voter identification law] that: 'Requiring purchased photo identification is a reprise of the notorious poll tax scheme used in the past to prevent voting;" ' and that "the ability to obtain certain types of photo identification costs money, which is unconstitutional in light of *Harper,* as a qualification based on affluence . . . .").

few voters likely will take advantage of the fee waiver affidavit option. In any event, as Plaintiffs' counsel correctly observes, the fact that some individuals avoid paying the cost for the Photo ID card does not mean that the Photo ID card is not a poll tax.

Moreover, even if the Court accepts as true Defendants' argument that the fee waiver affidavit option is realistically available for any voter who wishes to use that option, the fee waiver affidavit still runs afoul of the Twenty-fourth Amendment. As the Supreme Court noted in *Harman,* any material requirement imposed upon a voter solely because of the voter's refusal to pay a poll tax violates the Twenty-fourth Amendment. *Harman,* 380 U.S. at 542, 85 S.Ct. 1177. A voter who does not have another acceptable form of Photo ID and who wishes to vote must, as a practical matter, obtain a Photo ID card. To obtain a Photo ID card, the voter must arrange for transportation to a DDS service center or the GLOW bus, if that option is available, and must navigate the lengthy waiting process successfully. The voter then must pay the $20 fee or sign the fee waiver affidavit, which may require the voter to swear or affirm to facts that simply are not true in order to avoid paying the $20 fee. Under those circumstances, the Court cannot determine that the fee waiver affidavit is not a material requirement, as discussed in *Harman.* Consequently, the Court finds that the Photo ID requirement imposes a poll tax.

For the reasons discussed above, the Court concludes that the Photo ID requirement constitutes a poll tax. The Photo ID requirement thus violates the Twenty-fourth Amendment with respect to federal elections and violates the Equal Protection Clause with respect to State and municipal elections. Under those circumstances, the Court concludes that

Plaintiffs have a substantial likelihood of succeeding on the merits with respect to their poll tax claim.

**4. Civil Rights Act of 1964**

Alternatively, Plaintiffs contend that Georgia's Photo ID requirement violates the Civil Rights Act of 1964, 42 U.S.C.A. § 1971 by applying different standards to absentee and in-person voters within the same county and by precluding voting due to an omission that is not material to the right to vote under Georgia law. Defendants argue that both of Plaintiffs' claims under § 1971 fail as a matter of law because § 1971 does not furnish a private right of action. Because that argument may dispose of Plaintiffs' § 1971 claims, the Court addresses that argument before turning to the particulars of Plaintiffs' claims.

Defendants rely on language in § 1971(c) stating that "the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventative relief, including an application for a permanent or temporary injunction, restraining order, or other order." (State Defs.' Br. Opp'n Pls. Mot. Prelim. Inj. at 49 (citation omitted).) Defendants rely wholly on the quoted statutory language and cite two cases as additional support for their argument: *Willing v. Lake Orion Community Schools Board of Trustees,* 924 F.Supp. 815, 820 (E.D.Mich.1996), and *Good v. Roy,* 459 F.Supp. 403, 405 (D.Kan. 1978). Defendants further contend that even if § 1971 affords Plaintiffs a private right of action, Plaintiffs' claims still fail because the Photo ID requirement does not discriminate on the basis of race, color, or previous condition.

The Eleventh Circuit directly addressed the issue of whether § 1971 could be enforced by a private right of action in

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003). In *Schwier*, the Eleventh Circuit reversed a district court ruling which relied on *McKay v. Thompson*, 226 F.3d 752 (6th Cir.2000), which in turn relied entirely on *Willing*, which in turn relied entirely on *Good*—the two cases cited by Defendants. The Eleventh Circuit held that "the provisions of section 1971 of the Voting Rights Act may be enforced by a private right of action under § 1983." *Schwier*, 340 F.3d at 1297. The Eleventh Circuit's holding is not limited to the fact pattern at issue in *Schwier*, regarding an individual's refusal to disclose his social security account number, and Judges Dubina, Black, and Ryskamp conducted a thorough analysis of the legislative history behind § 1971(c) and the Supreme Court's rationale behind holdings permitting private rights of action to enforce other sections of the Voting Rights Act. *Id.* at 1294–95. The Court is bound to apply *Schwier*, and the Court consequently finds as a matter of law that Plaintiffs may assert a private right of action under § 1971 for the alleged voting rights violations at issue.

#### a. 42 U.S.C.A. § 1971(a)(2)(A)

First, Plaintiffs argue that Georgia's Photo ID requirement violates 42 U.S.C.A. § 1971(a)(2)(A) by applying different standards in determining whether individuals within the same county or other political subdivision are qualified to vote. 42 U.S.C.A. § 1971(a)(2)(A) provides that "[n]o person acting under color of state law shall," when "determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote." 42 U.S.C.A. § 1971(a)(2)(A).

Plaintiffs argue that the Photo ID requirement runs afoul of this subsection because the Photo ID requirement applies different standards to voters who reside in the same city or county who vote absentee than it applies to people who vote in person. Plaintiffs note that the Photo ID requirement applies only to voters who vote in person at the polls, while voters who vote absentee by mail do not have to comply with the Photo ID requirement unless they are registering to vote absentee, or are voting absentee for the first time. Additionally, voters who registered by mail and are voting by absentee ballot for the first time may include a utility bill or bank statement with their absentee ballot as a means of voter identification. (Oct. 12, 2005, Hr'g Tr.)

Plaintiffs point out that although the stated purpose of the Photo ID requirement is to prevent voter fraud, the Photo ID requirement does nothing to address the largest sources of potential voter fraud—absentee voting and fraudulent voter registrations. In support of this argument, Plaintiffs cite to correspondence from Secretary of State Cox to Governor Perdue and the Georgia State Senate with respect to HB 244 indicating that over her tenure, she and her staff could not recall a single case or complaint of voter impersonation at the polls. In contrast, her office received numerous complaints of fraudulent absentee voting during the same time period. HB 244, in Secretary of State Cox's opinion, expanded opportunities for absentee voting by mail by eliminating the previous restrictions on obtaining an absentee ballot. Consequently, Plaintiffs contend that the Photo ID requirement, by its plain language, clearly violates 42 U.S.C.A. § 1971(a)(2)(A) because it imposes standards on voters in the same county

or city that differ for absentee voters versus in-person voters.

Defendants contend that HB 244 does not apply different standards in determining whether any individual is qualified under State law to vote in person in any election. Defendants argue that individuals who choose to vote in person are all held to the same standard regardless of their race or color, and that individuals who choose to vote by absentee ballot are all held to the same standard regardless of their race or color.

Plaintiffs cited no case law and provided limited information in support of this claim at the preliminary injunction hearing. The Court therefore cannot determine at this point that Plaintiffs have a substantial likelihood of succeeding on the merits of this claim. Because Plaintiffs may be able to produce evidence and authority at a later stage of the proceedings that support this claim, the Court reserves a ruling on the merits of a claim for a later date.

### b.  42 U.S.C.A. § 1971(a)(2)(B)

Second, Plaintiffs contend that Georgia's Photo ID requirement violates 42 U.S.C.A. § 1971(a)(2)(B), which prohibits a person acting under color of law from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 42 U.S.C.A. § 1971(a)(2)(B).

Plaintiffs contend that to be qualified to vote in Georgia, a voter need only: (1) be a United States citizen; (2) be a legal resident of the county where he or she seeks to register; (3) be at least 18 years old; and (4) not be serving a sentence for a felony conviction involving moral turpitude

or have been found mentally incompetent by a judge. Ga. Const. art. II, § 1. Plaintiffs observe that none of those requirements include presenting a Photo ID, and that a Photo ID therefore cannot be material to determining whether an individual is qualified under State law to vote. In any event, Plaintiffs argue that because the Photo ID requirement does not apply to most absentee voters, the Photo ID requirement cannot be said to be "material" for purposes of 42 U.S.C.A. § 1971(a)(2)(B).

Defendants contest these assertions and argue that Plaintiffs' claim must fail because the Photo ID requirement does not add any condition on voter qualifications and that there is no error or omission on any record that is being used to disqualify any potential voter. Further, Defendants point out that a legislature traditionally has been allowed to reform state law one step at a time and therefore, the General Assembly may address one potential avenue for voter fraud at a time.

Plaintiffs cited no case law and provided limited information in support of this claim at the preliminary injunction hearing. At this point, the Court simply cannot determine whether Plaintiffs have a substantial likelihood of succeeding on the merits of this claim. Because Plaintiffs may be able to present sufficient evidence and authority to succeed on this claim at a later stage of the proceedings, the Court will not rule on the merits of the claim at this time.

### 5.  Voting Rights Act of 1965

Finally, Plaintiffs argue that the Photo ID requirement violates Section 2 of the Voting Rights Act, 42 U.S.C.A. § 1973(a). That statute provides, in relevant part: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State

or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section." 42 U.S.C.A. § 1973(a). 42 U.S.C.A. § 1973(b) sets forth the requirements for establishing a violation of § 1973(a), and states:

> A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973(b).

Plaintiffs assert a claim of vote denial under § 1973(a), rather than a claim of vote dilution. The Supreme Court, however, has observed that Section 2 of the Voting Rights Act prohibits all forms of voting discrimination, not simply vote dilution. *Thornburg v. Gingles,* 478 U.S. 30, 45 n. 10, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). After the 1982 amendments to the Voting Rights Act, a plaintiff asserting a violation of Section 2 need not present "proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against mi-

nority voters." *Id.* at 44, 106 S.Ct. 2752. Instead, the plaintiff must show that " 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.' " *Id.* The Supreme Court has observed:

> In order to answer this question, a court must assess the impact of the contested structure or practice on minority electoral opportunities "on the basis of objective factors." The Senate Report specifies factors which typically may be relevant to a § 2 claim: the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value. The Report stresses,

however, that this list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly vote dilution claims, other factors may also be relevant and may be considered. Furthermore, the Senate Committee observed that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." Rather, the Committee determined that "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,'" and on a "functional" view of the political process.

*Id.* at 44–45, 106 S.Ct. 2752 (citations omitted; footnote omitted). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. 2752.

Similarly, in *Johnson v. Governor of the State of Florida*, 405 F.3d 1214 (11th Cir. 2005), the United States Court of Appeals for the Eleventh Circuit observed:

Vote denial occurs when a state employs a "standard, practice, or procedure" that results in the denial of the right to vote on account of race. To prevail, a plaintiff must prove that "under the totality of the circumstances, ... the political processes ... are not equally open to participation by [members of a protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." In making this inquiry, courts consider a non-exclusive list of objective factors (the "Senate factors")

detailed in a Senate Report accompanying the 1982 amendments.

405 F.3d at 1228 n. 26 (citations omitted) (alterations and omissions in original).

Plaintiffs have presented declarations and Census data in support of their § 2 vote denial claim. Specifically, Plaintiffs point to socio-economic data from the 2000 Census indicating that in Georgia: (1) 17.3 percent of African–American households have an income of less than $10,000, compared to 7.4 percent of Caucasian, non-Hispanic households; (2) an additional 16.0 percent of African–American households have incomes between $10,000 and $19,999, compared to 10.1 percent of Caucasian, non-Hispanic households; (3) 27.5 percent of African–Americans ages twenty-five or older have less than a high school education, including general equivalency degrees, as compared with 17.3 percent of Caucasian, non-Hispanics ages twenty-five or older; (4) 23.1 percent of African–Americans of all ages live below the poverty line, compared to 7.8 percent of Caucasian, non-Hispanic individuals; (5) 24.7 percent of African–Americans ages sixty-five through seventy-four live below the poverty line, as compared to 7.8 percent of Caucasian, non-Hispanic individuals in the same age group; (6) 32.1 percent of African–Americans aged seventy-five and over live below the poverty line, as compared to 12.9 percent of Caucasian, non-Hispanic individuals aged seventy-five or over; (7) 17.7 percent of African–American households have no vehicle available, as compared to 4.4 percent of Caucasian, non-Hispanic households; and (8) only one of the eight Georgia counties with the highest percentage of African–American residents—sixty percent or higher—has a DDS service center. Plaintiffs also plan to present data indicating that in Georgia, 11.0 percent of Caucasians, 26.0 percent of African–Americans, and 30.0 percent of

Latinos live below the poverty line. Plaintiffs argue that this evidence is sufficient to show depressed political participation by minorities and to demonstrate that the Photo ID requirement will discourage voting by minority voters.

At this point, however, the Court simply cannot agree with Plaintiffs that the evidence is sufficient to demonstrate that Plaintiffs have a substantial likelihood of succeeding on the merits with respect to their § 2 vote denial claim. The Court therefore is reluctant to grant preliminary injunctive relief to Plaintiffs based on their § 2 vote denial claim. Recognizing that Plaintiffs may be able to produce sufficient evidence at a later stage of the proceedings to support their § 2 vote denial claim, the Court reserves a final ruling on the merits of that claim for a later date.

### B. Irreparable Harm

██ The Court next addresses the second factor for obtaining a preliminary injunction—whether Plaintiffs will suffer irreparable harm if the Court does not enter a preliminary injunction. For the reasons discussed *supra* Part III.A., the Court concludes that the Photo ID requirement unduly burdens the fundamental right to vote, and likely will cause a number of Georgia voters to be unable to cast a vote and to have their votes counted. The Court also concludes that the Photo ID requirement constitutes a poll tax.

Although Defendants argue that the Photo ID requirement will not deprive a single Georgia voter of the right to vote, because voters without Photo IDs can vote absentee ballots, as a practical matter, a significant number of the registered Georgia voters who lack Photo IDs likely are unaware of that alternative or would not be able to navigate the absentee ballot voting process successfully. Voters who lack Photo IDs and are unaware of the

absentee voting alternative, yet still desire to vote, must undertake the often difficult and burdensome process of obtaining a Photo ID card. Still others who can navigate this process successfully either must pay a fee for a Photo ID card or sign an Affidavit swearing that they are indigent and do not have the funds to pay for the card—whether or not that statement is true—to obtain a free Photo ID card. The Photo ID requirement thus has the likely effect of causing a significant number of Georgia voters to forego going to the polls or to forego obtaining and voting an absentee ballot. For the reasons discussed above, the Court finds that Plaintiffs have demonstrated that they or their constituents will suffer irreparable harm if the Court declines to enter a preliminary injunction. This factor therefore weighs in favor of granting Plaintiffs' Motion for Preliminary Injunction.

### C. Threatened Injury to Plaintiffs Weighed Against the Damage to the State Caused by a Preliminary Injunction

Next, the Court must weigh the threatened injury to Plaintiffs against the damage to the State caused by a preliminary injunction. Defendants presented evidence that the entry of a preliminary injunction likely will result in confusion for voters, poll workers, and elections officials, and may result in an inconsistent application of the identification requirements. Defendants have pointed out that it will be extremely difficult for the Elections Division to produce new voter certificates and posters and for all local elections officials to receive sufficient numbers of voter certificates and posters for polling locations. Further, Defendants' evidence indicates that local elections officials lack sufficient time to conduct training for poll workers and to educate the public.

The Court certainly appreciates and understands the inconvenience and expense that entering a preliminary injunction may work upon the State and Defendants. The Court, however, is mindful that the right to vote is a fundamental right and is preservative of all other rights. Denying an individual the right to vote works a serious, irreparable injury upon that individual. Given the right at issue and the likely injury caused by not entering a preliminary injunction, the Court finds that the potential injury to Plaintiffs outweighs the harm to the State and Defendants caused by entering a preliminary injunction. This factor therefore counsels in favor of entering a preliminary injunction.

### D. Public Interest

Finally, the Court must determine whether issuing a preliminary injunction will serve the public interest. At the outset, the Court acknowledges that preventing voter fraud serves the public interest by ensuring that those individuals who have registered properly to vote are allowed to vote and to have their votes counted in any given election. As discussed *supra* Part III.A., however, the current Photo ID requirement simply is not targeted toward eliminating or preventing the only types of voter fraud that are supported by the evidence presented thus far: fraudulent voter registrations and fraudulent absentee voting. Rather, HB 244 opens the door wide for fraudulent absentee voting by removing the conditions for obtaining an absentee ballot. As discussed *supra* Parts III.A.2. and A.3., the Photo ID requirement unduly burdens the right of many properly registered Georgia voters to vote, is a poll tax, and has the likely effect of causing many of those voters to forego voting or of precluding those voters from voting at the polls. Because the right to vote is a fundamental right, removing the undue burdens on that right imposed by the Photo ID requirement serves the public interest. This factor therefore counsels in favor of granting Plaintiffs' Motion for Preliminary Injunction.

### E. Summary

In sum, the Court finds that the four factors for granting a preliminary injunction weigh in favor of Plaintiffs. In particular, the Court concludes that Plaintiffs have a substantial likelihood of success on the merits of their claim that the Photo ID requirement unduly burdens the right to vote and a substantial likelihood of success on the merits of their claim that the Photo ID requirement constitutes a poll tax. The Court also finds that Plaintiffs and their constituents will suffer irreparable harm if the Court does not grant a preliminary injunction, and that the threatened harm to Plaintiffs outweighs the injury to Defendants and the State that will result from issuing a preliminary injunction. Finally, the Court finds that entering a preliminary injunction will serve the public interest. Consequently, the Court grants Plaintiffs' Motion for Preliminary Injunction.

In reaching this conclusion, the Court observes that it has great respect for the Georgia legislature. The Court, however, simply has more respect for the Constitution. Because the Court finds that Plaintiffs have a substantial likelihood of succeeding on their claims that the Photo ID requirement unduly burdens the right to vote and constitutes a poll tax, the Court must enter a preliminary injunction against the Photo ID requirement.[10]

---

**10.** The Court acknowledges that its conclusion differs from the decisions reached in

*League of Women Voters v. Blackwell,* 340 F.Supp.2d 823 (N.D.Ohio 2004), *Bay County*

## IV. Conclusion

ACCORDINGLY, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction [2][23], and **ENJOINS** and restricts Defendants individually and in their official capacities from enforcing or applying the 2005 amendment to O.C.G.A. § 21–2–417

(Act No. 53, Section 59), which requires voters to present a Photo ID as a precondition to in-person voting in Georgia, to deny Plaintiffs or any other registered voter in Georgia admission to the polls, a ballot, or the right to cast their ballots and to have their ballots counted in any special, general, run off, or referenda election in

*Democratic Party v. Land,* 347 F.Supp.2d 404 (E.D.Mich.2004), and *Colorado Common Cause v. Davidson,* No. 04CV7709, 2004 WL 2360485 (D.Colo. Oct. 18, 2004). All of those cases, however, involved identification requirements that allowed voters to show means of identification other than Photo IDs. Georgia's Photo ID requirement, however, applies to in-person voting and goes one step further than the laws challenged in *Blackwell, Bay County Democratic Party,* and *Colorado Common Cause.*

For instance, *Blackwell* involved a challenge to an Ohio law implementing HAVA that required individuals who registered to vote by mail and who did not submit acceptable documentary proof of identity with their voter applications to provide "acceptable documentary proof" of their identities prior to voting. 340 F.Supp.2d at 826. Such proof could include "a current and valid photo identification," or "[a] copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows [the voter's] name and address." *Id.*

*Bay County Democratic Party,* in turn, involved a challenge to directives issued to Michigan local elections officials concerning casting and tabulating provisional ballots, as well as a directive pertaining to proof of identity for first-time voters who registered by mail. 347 F.Supp.2d at 410–11. The directive concerning proof of identity for first-time in-person voters who registered by mail was revised to allow those voters to furnish the identification required by HAVA either at the polls or during a six-day period after election day. *Id.* at 434. The HAVA requirements, however, allowed individuals who registered by mail to present a current, valid Photo ID or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the

name and address of the voter." 42 U.S.C.A. § 15483.

Finally, *Colorado Common Cause* also involved identification requirements that permitted voters to show several forms of identification, including: (1) a valid Colorado driver's license; (2) a valid ID card from the Colorado Department of Revenue; (3) a valid United States passport; (4) a valid government employee Photo ID; (5) a valid pilot's license; (6) a valid United States military Photo ID; (7) a copy of a current utility bill, a bank statement, government check, paycheck, or other government document showing the voter's name and address; (8) a valid Medicaid or Medicare card; (9) a certified copy of a birth certificate; or (10) certified documentation of naturalization. 2004 WL 2360485, at *6. The *Colorado Common Cause* court observed that the identification requirement was intended to reduce voter fraud, and concluded that the identification requirement was reasonably related to the interest proffered by the state and was not unduly burdensome. *Id.* at *10.

The identification requirements used by Ohio, Michigan, and Colorado, however, are of little relevance to the case now before the Court because those requirements are much less stringent than Georgia's Photo ID-only requirement. Each of the requirements challenged in *Blackwell, Bay County Democratic Party,* and *Colorado Common Cause* allowed voters to produce alternative forms of identification as well as Photo IDs. If Georgia's voter identification law permitted use of such alternative means of identification for purposes of in-person voting, Plaintiffs likely would not have filed this case. In sum, given the unique nature of Georgia's Photo ID requirement, the Court finds *Blackwell, Bay County Democratic Party,* and *Colorado Common Cause* cases unpersuasive. The Court therefore declines to follow those cases.

the State of Georgia because of their failure or refusal to present a Photo ID.